JUDGE FORREST

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

8 LEGGED PRODUCTIONS, LLC,

             Plaintiff,

       v.

STAGE DIRECTORS AND
CHOREOGRAPHERS SOCIETY, INC.,
LOH, INC., AND JULIE TAYMOR,

             Defendants.

CASE NO.

12 CIV 0377

**COMPLAINT AND DEMAND FOR JURY TRIAL**

RECEIVED
JAN 17 2012
N.Y.
CASHIERS

Plaintiff 8 Legged Productions, LLC ("Plaintiff" or "8 Legged"), by and through its

undersigned counsel, hereby complains and alleges, with personal knowledge except as to those

allegations made upon information and belief, as follows:

## NATURE OF THE ACTION

1.    This is an action brought by 8 Legged, the lead producer of the Broadway musical

*Spider-Man: Turn Off the Dark* (the "Musical" or "*Spider-Man*"), against the Musical's former

director and collaborator, Julie Taymor ("Taymor"), Taymor's wholly-owned business entity

through which she works, LOH, Inc. ("LOH"), and the Stage Directors and Choreographers

Society, Inc. (the "SDC"), a union that claims to represent Taymor.  Defendants have conspired

and agreed, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to fix minimum royalty

rates, health and pension benefits, and other non-bargained for compensation for Taymor's

services as *Spider-Man's* director, collaborator and mask designer at supracompetitive levels, by

purporting to impose the Collective Bargaining Agreement between The Broadway League and

the SDC (the "Illegal Agreement") upon Taymor's work on the Musical.

2.      8 Legged is not, and never has been, a member of the Broadway League or its predecessor, the League of American Theatres and Producers. 8 Legged is not a signatory to the Illegal Agreement, nor has 8 Legged consented to the imposition of the Illegal Agreement's terms on Taymor's work on the Musical.

3.      Defendants are not immune from antitrust liability because Taymor is an independent contractor and Defendants' conduct is outside the purview of the National Labor Relations Act (NLRA). Independent contractors are expressly excluded from the definition of "employees" under the NLRA. 29 U.S.C. §152(3). On information and belief, the purpose for Defendants' alleged establishment of a purported collective bargaining relationship with respect to the Musical is to provide a veneer of legitimacy to Defendants' unlawful conduct.

4.      Taymor is not a member of any bargaining unit legitimately represented by the SDC because Taymor is an independent contractor, not an employee. Unlike in *Julien v. Society of Stage Directors and Choreographers, Inc.*, Civ. No. 68-5120, 1975 WL 957, *3 (S.D.N.Y. Oct. 14, 1975), where the SDC argued that the director of a show was an employee of the producer as the producer had "the right to and does exercise control over all facets of the production and of the director's work," had "pervasive control over the artistic direction of the play," and had the ability to "add or delete scenes, overruling any objections raised by the director," here, the SDC has taken the opposite position with respect to Taymor, contending that she reserved complete control over her own work and that 8 Legged had virtually no management rights over the creative aspects of the Musical. As such, Taymor was never an employee of 8 Legged or the Musical. Rather, she was an independent contractor who does not fall within the coverage of the NLRA and whose economic conditions cannot be regulated by any combination of unions and independent contractors under the NLRA.

5.    Furthermore, the SDC is not a lawfully recognized representative of any employees of 8 Legged or the Musical (including alleged employee Taymor), as required by federal labor law and the rules of the National Labor Relations Board ("NLRB"). The individuals the SDC claims to represent are independent contractors who may not act collectively to fix prices for services under the antitrust laws, and who are not provided any protection or privilege to do so by the NLRA. Indeed, the entire alleged collective bargaining relationship at issue in this case is a sham. No authorized party has ever made a determination of an appropriate unit for bargaining as required by the NLRA. No employees of 8 Legged or the Musical have demonstrated, through a lawful election or other valid process, their majority support for the SDC to be their representative. The SDC has never engaged in bargaining with 8 Legged under the NLRA. 8 Legged has never signed an agreement with the SDC. In short, the SDC never obtained a lawful right to represent any employees or other individuals (including Taymor) in an appropriate and lawful bargaining unit with respect to the Musical. When stripped to its essence, the SDC's attempt to "represent" Taymor with respect to her work on the Musical is nothing more than a unlawful conspiracy among independent contractors and the union operating under the guise of a fictitious collective bargaining relationship.

6.    That the alleged collective bargaining relationship is a subterfuge for an unlawful antitrust conspiracy is evident from Defendants' attempts to extend the Agreement to cover all manner of commercial relationships. Defendants are seeking to impose the terms of the Illegal Agreement upon Taymor's work, not only as a director, but also as a collaborator and a mask designer on the Musical. The SDC, however, does not even purport to represent collaborators or mask designers (both of which are also independent contractors) and has no authority to seek to impose terms regarding Taymor's collaboration or mask design work.

7.     Because the Illegal Agreement cannot lawfully exist or extend to Taymor's work on the Musical, Defendants' conspiracy to impose the terms of the Illegal Agreement upon Taymor's work on the Musical is not immune from antitrust liability under either the "statutory" or the "non-statutory" labor exemptions. *See* 15 U.S.C. § 17; 29 U.S.C. §§ 101, 107; *United States v. Hutcheson*, 312 U.S. 219, 231-32 (1941) (statutory exemption); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965) and *Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676 (1965) (non-statutory exemption).  To the contrary, by its very essence, the Illegal Agreement is a horizontal agreement among competing suppliers of directorial, collaborator, and mask design services, including Defendant Taymor, orchestrated by Defendant SDC, to fix compensation, including minimum royalty rates and health and pension benefits, exclude competitors, allocate markets, and otherwise restrain trade.  Accordingly, Defendants' conspiracy to impose the terms of the Illegal Agreement upon Taymor's work on the Musical is a *per se* unlawful violation of Section 1 of the Sherman Act.

8.     In a wrongful attempt to enforce the Illegal Agreement, on June 9, 2011, the SDC initiated an arbitration against 8 Legged with a single arbitrator of the SDC's choosing, pursuant to the Illegal Agreement's purported dispute resolution procedure (the "Illegal Arbitration"). The Illegal Arbitration seeks, among other things, to force 8 Legged to pay Taymor full royalties as director and collaborator despite the fact that Taymor caused numerous delays, drove up costs, and failed to direct a Musical about Spider-Man that could open on Broadway.  Moreover, Taymor seeks full compensation as a director even though she refused to make the changes to the show that were requested by the producers.  As a result, the producers had no choice but to bring in and compensate a new director to perform the services that Taymor would not and could not do.

4

9.      Ironically, the SDC now seeks from 8 Legged full compensation for Taymor even though the only reason the show is still running and still paying its cast and crew is because that new director, Philip Wm. McKinley, director of the five-time Tony-nominated Broadway musical *The Boy From Oz*, was brought in and was efficiently able to make the changes to the show that Taymor refused to make.

10.     As Taymor is not entitled to the fruits of an unlawful conspiracy and the SDC cannot enforce the terms of the Illegal Agreement, 8 Legged seeks, among other things, a declaration that Defendants' attempt to impose the terms of the Illegal Agreement upon Taymor's work on the Musical violates the Sherman Act, a declaration that the Illegal Agreement does not apply to Taymor's work on the Musical, a declaration that the Illegal Arbitration is unlawful, an order enjoining the arbitrator from issuing a decision in the Illegal Arbitration and preventing Defendants from engaging in similarly unlawful practices in the future, and an award of treble damages from Taymor, LOH and the SDC.

## THE PARTIES

11.     Plaintiff 8 Legged is a domestic limited liability company duly organized and existing under the laws of the State of New York and having its principal place of business in this District.  8 Legged is not, and never has been, a member of the Broadway League or its predecessor entity the League of American Theatres and Producers.  8 Legged is not now, and never has been, represented by those organizations and does not consent to such representation.

12.     Upon information and belief, Defendant SDC is a domestic not-for-profit corporation duly organized and existing under the laws of the State of New York and having its principal place of business in this District.

13.     Upon information and belief, Defendant LOH is a corporation duly organized and existing under the laws of the State of New York and having its principal place of business in this District.  Upon information and belief, LOH is a commercial vehicle through which Defendant Taymor works and contracts, and Taymor is the principal of, and controls, LOH.

14.     Upon information and belief, Defendant Taymor is an individual who resides in this District.

15.     Defendants LOH and Taymor are collectively referred to herein as the "Taymor Defendants."

## JURISDICTION AND VENUE

16.     8 Legged's civil antitrust claim arises under Section 1 of the Sherman Act, 15 U.S.C. § 1.  8 Legged seeks treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

17.     Subject matter jurisdiction over 8 Legged's federal antitrust claims is proper under 28 U.S.C. §§ 1331 and 1337(a).  Jurisdiction over 8 Legged's claim for declaratory relief is proper under 28 U.S.C. § 2201.

18.     Venue is proper in this Court pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to these claims occurred within this District and because all of the Defendants reside or maintain their principal place of business in this District.

## FACTUAL ALLEGATIONS

**A.      Taymor Is Retained as the Musical's Collaborator
         and Director Pursuant to a July 12, 2005 Term Sheet.**

19.     In or around 2004, Defendant Taymor was asked to direct and collaborate on the Musical by the Musical's then lead producer, Hello Entertainment, LLC ("Hello Entertainment")

and its principals David Garfinkle and Tony Adams. On July 12, 2005, Hello Entertainment entered into a term sheet with the Taymor Defendants concerning services that Taymor was contracted to perform in various roles in connection with the Musical, and her compensation for each role. A true and correct copy of this term sheet is attached hereto, as **Exhibit 1** (the "Term Sheet"). The Term Sheet governed Taymor's relationship with the production and encompassed her duties and responsibilities, as well as compensation, for several roles separate and in addition to her role as director.

20.     Thus, while the Term Sheet outlined the "material terms upon which the parties have agreed Taymor will direct" the Musical, and set out the royalty fee that Taymor was to receive as a director, the Term Sheet also outlined the terms upon which Taymor would collaborate on the Musical and separately set out the royalty fee that Taymor was to receive as a collaborator. Ex. 1 at ¶ 3. In addition, the Term Sheet also contained a provision concerning "Subsidiary Rights," which discussed the percentage of gross retail sales that Taymor would be entitled to for "any merchandise using any of Taymor's designs that Taymor is specifically hired to create for the Musical (i.e., costume or puppet designs, to the extent that she is a costume or puppet designer)." *Id.* at ¶ 5. Notably, the Term Sheet contained no arbitration agreement nor did it contain any agreement concerning the payment of health and pension benefits on Taymor's behalf. The SDC was not a party to the Term Sheet nor did the Term Sheet mention either the SDC or the Illegal Agreement.

**B.     8 Legged Becomes the Musical's Lead Producer, but 8 Legged and Taymor Are Unable to Agree on a Long Form Agreement and None is Ever Executed.**

21.     Upon information and belief, on October 22, 2005, Mr. Adams died unexpectedly and Mr. Garfinkle took over Hello Entertainment's operations.

22.     Upon information and belief, in or around 2009, Hello Entertainment faced financial difficulties that threatened the future of the Musical.  Paul Hewson of the popular rock band U2 (known professionally as "Bono"), who was then collaborating on the Musical's original score, solicited the assistance of Michael Cohl and Jeremiah Harris.  In response, Mr. Cohl and Mr. Harris formed 8 Legged, and 8 Legged took over as lead producer of the Musical and assumed Hello Entertainment's rights and liabilities under the Term Sheet.

23.     Although the Term Sheet contemplated that "[t]he parties will enter into a long form agreement . . . which incorporates the above stated terms as well as other terms that are found in director/collaborator agreements, including terms regarding billing, fees and/or advances related to the right of first refusal to direct other first class companies, timing of approvals and expenses" (Term Sheet at 3), a *long form agreement was never agreed or executed.*

**C.     Taymor is Terminated and SDC Initiates the Illegal
Arbitration On Behalf Of The Taymor Defendants**

24.     On November 28, 2010, more than six (6) years after Taymor assumed the helm as *Spider-Man's* director and collaborator, the Musical finally played its first public preview performance on Broadway.  As a result of inefficient rehearsals and Taymor's unwillingness and inability to follow a schedule, this was the first time that the cast and crew performed a full run-through of the show, which at that point still lacked an ending.

25.     By February 2011, although the show was still not ready to be opened and the show's official opening had been postponed for a fifth time, the press decided to review the show anyway.  The reviews were uniformly negative.

26.     Moreover, focus group surveys conducted to assess audience reaction showed that audiences did not understand or enjoy the Musical to the level required for it to be successful.

27.    Although the producers asked Ms. Taymor to make changes to the direction of the Musical, Taymor refused to do so.  As a result of Taymor's refusal to cooperate or perform, on or about March 4, 2011, 8 Legged terminated Taymor as the Musical's director and collaborator and brought in another director to direct a new *Spider-Man* Musical based on a new book written by Glen Berger and Roberto Aguirre-Sacasa.  The cast and crew worked to rehearse the new show during the day, while performing the old show at night.  The Musical then had to be closed for more than three (3) weeks in April and May 2011 so that all efforts could be focused on implementing the new show.  The new show was reopened in previews on May 12, 2011.  The Musical officially opened on Broadway on June 14, 2011 to greatly improved critical reviews and has since been well attended.

28.    Days before the new show's official opening, on June 9, 2011, the SDC initiated the Illegal Arbitration on behalf of the Taymor Defendants.  A true and correct copy of the SDC's demand for arbitration is attached hereto as **Exhibit 2.**  In its demand for arbitration, the SDC wrongfully informed the arbitrator, whom the SDC unilaterally selected, that "[t]he Producer has adopted and incorporated the terms of the current collective bargaining agreement between the SDC and the Broadway League [] into its agreements with SDC members, including Julie Taymor." Exhibit 2 at 1.  The SDC then demanded that the arbitrator initiate the Illegal Arbitration pursuant to Article XVI of the Illegal Agreement.  A true and correct copy of the Illegal Agreement is attached hereto as **Exhibit 3**.

29.    The Illegal Arbitration has been proceeding before the single arbitrator of the SDC's choosing pursuant to the Illegal Agreement's terms.  The SDC presented its claims to the arbitrator in a hearing held on October 3 and 4, 2011 and will recommence on February 13, 2012.

30.     Through the Illegal Arbitration, the SDC improperly seeks, on behalf of the Taymor Defendants, not only an award of the royalties allegedly due Taymor as a director, but also as a collaborator and a mask designer. During the Illegal Arbitration, 8 Legged objected to the arbitrator hearing the disputes relating to Taymor's compensation as a collaborator and mask designer on the Musical, as 8 Legged never agreed to arbitrate those disputes and they are therefore outside the arbitrator's jurisdiction.  8 Legged now seeks a declaration from this Court that the entire Illegal Arbitration is unlawful, null, and void as it is the product of Defendants' antitrust conspiracy.

**D.    The Illegal Agreement is a Horizontal Agreement
Among Competitors to Fix Prices and Restrain Competition**

31.     On information and belief, theater directors, including Taymor, offer directorial services to producers of first class theatrical productions on Broadway and elsewhere.  Absent an agreement among theater directors not to compete with each other, theater directors compete with each other for work on theatrical productions on a variety of grounds, including the compensation they receive in various forms (such as fees, royalties, and other rights to future income streams) and other terms of engagement (such as dispute-resolution mechanisms, health and pension benefits payments and expense reimbursements).

32.     On information and belief, theater directors who are members of the SDC, including Taymor, agree, as a condition of membership in the SDC, to abide by the terms of the Illegal Agreement when they work on first class theatrical productions on Broadway and elsewhere.  Indeed, the SDC's bylaws (the "Bylaws"), a copy of which is attached hereto as **Exhibit 4**, impose both the essential terms of this agreement and the enforcement mechanisms through which the SDC ensures its members' compliance.  In particular:

- Article VIII(B)(1) of the Bylaws provides that the SDC, through its Executive Board, will "establish basic agreements with producers and managers of theatrical productions in all branches of the industry to govern rates of compensation and working conditions of its Members."   Exhibit 4 at 10. These rate-fixing agreements "shall be established through individual and/or collective agreements, negotiated and/or promulgated by the [SDC]." *Id.*

- Article VIII(D) of the Bylaws obligates SDC members to cooperate with the SDC's efforts to impose the above basic agreements on producers and provides for fines and disciplinary action against members who do not do so. *Id.* at 11.

- Article VIII(E) ensures that no producer can hire an SDC member unless the producer enters into the basic agreement, even if there is no legitimate bargaining unit.   It provides that "no Member shall accept employment or continue employment from a producer or manager of theatrical productions who is not a signatory to an agreement containing the basic provisions covering compensation and working conditions established, or to be established, for that division of the industry." *Id.* at 11.

- Article VIII(H) provides a mechanism for the SDC to monitor compliance with the scheme, by obligating "every Member to report immediately to the [SDC] any directorial/choreographic assignment he or she has secured, and to provide the [SDC] with a copy of the terms of his or her engagement, where such engagement is covered by an existing, collective agreement or Work Rule." *Id.* at 11.

33.     Similar obligations, penalties, and monitoring mechanisms are scattered throughout the SDC's Work Rules and Guidelines, which are attached to the Bylaws and are mandatory for SDC members.  In particular:

- Article I of the Work Rules requires all SDC members to file SDC-approved form employment contracts prior to commencement of rehearsals and provides for severe penalties for failure to do so.  Exhibit 4 at 15.

- Article II of the Work Rules provides for severe penalties against members who work for producers that are on the SDC's strike list. *Id.* at 15.

- Article III of the Work Rules provides for "disciplinary action against a Member who signs a contract agreeing to fees, royalties, or other terms and conditions less than those stipulated in the applicable SSDC Minimum Basic Agreement, as determined by the [SDC]." *Id.* at 16.

- Article IV of the Work Rules provides for severe penalties against the SDC members who agree to certain modifications of their royalties without prior SDC approval. *Id.* at 16.

- Article VII(B) of the Work Rules obligates every SDC member to notify the SDC immediately when dismissed from a theatrical production.  Ex. 6 at 17.

- Article VII(C) of the Work Rules obligates every SDC member to notify the SDC immediately when engaged to replace another SDC member on a theatrical production. *Id.* at 17.

- Article VII(D) of the Work Rules provides that "[a]ll of the [SDC's] Minimum Basic Agreements provide for mandatory Pension and Welfare

contributions by the producer on behalf of the director and choreographer." *Id.* at 18.

- Article VII(E) of the Work Rules obligates SDC members to notify the SDC immediately when negotiating for employment by a producer who is not a signatory of a "Society Minimum Basic Agreement" or who is unwilling to execute "a proper SSDC form contract." *Id.* at 18.

34.     By imposing the terms of the above agreements among SDC members and providing stringent mechanisms for enforcing those agreements, including ensuring SDC members' adherence to the Illegal Agreement, the SDC's Bylaws and Work Rules implement a horizontal conspiracy in restraint of trade among SDC members, including Taymor.  Through its Bylaws and Work Rules, the SDC orchestrates that conspiracy among SDC members to fix prices, boycott competitors, allocate markets, restrict output, and otherwise restrain competition with respect to the services of theater directors on first class theatrical productions on Broadway and elsewhere.

35.     The SDC's Bylaws and Work Rules compel member theatrical directors, including Taymor, to abide by the terms of the Illegal Agreement when seeking work on first class theatrical productions on Broadway and elsewhere.  Upon information and belief, theatrical directors, including Taymor, routinely agree to impose, and do impose, the terms of the Illegal Agreement upon producers of first class theatrical productions on Broadway and elsewhere.

36.     The Illegal Agreement is an agreement among theater directors who are SDC members (including Taymor), orchestrated by Defendant the SDC, to, among other things:

- Fix fee minimums for directors on first class theatrical productions on Broadway and elsewhere (Exhibit 3 at Articles I(D), III(F), IV(A), V(C), (E), and (F), VII(A), XI, and Schedule A);

- Exclude directors who are not SDC members from working on first class theatrical productions on Broadway and elsewhere (*id.* at Articles I(D) and II(A));

- Fix royalty floors for directors working on first class theatrical productions on Broadway and elsewhere (*id.* at Articles IV(B), V(D), VII(A));

- Fix health and pension benefits contributions made on behalf of directors working on first class theatrical productions on Broadway and elsewhere (*id.* at Article IX);

- Fix other contributions to be made by producers to the SDC on behalf of directors working on first class theatrical productions on Broadway and elsewhere (*id.* at Article I(G));

- Fix per diem expenses to be paid to directors working on first class theatrical productions on Broadway and elsewhere (*id.* at Article X);

- Fix the directors' future income streams deriving from future reproductions of first class theatrical productions on Broadway and elsewhere (*id.* at Article XII);

- Fix the directors' compensation from subsidiary rights with respect to first class theatrical productions on Broadway and elsewhere (*id.* at Article XIV);

- Impose other terms on theatrical producers including, among others, compulsory arbitration for the resolution of disputes arising out of the

directors' work on first class theatrical productions on Broadway and elsewhere (*id.* at Article XVI).

37.     As such, the Illegal Agreement is a conspiracy among competitors (including Taymor), orchestrated by the SDC, to fix prices, boycott competitors, allocate markets, restrict output, and otherwise restrain competition with respect to the services of theater directors on first class theatrical productions on Broadway and elsewhere.

38.     The Illegal Agreement furthers Defendants' unlawful conspiracy by coercing producers of first class theatrical productions on Broadway and elsewhere to use as directors only persons who are parties to the unlawful conspiracy. Article III(F) of the Illegal Agreement prohibits the dismissal of a director except for breach of contract and obligates a producer who dismisses a director on any other grounds to continue to pay the dismissed director in full even after dismissal, unless the replacement director is also covered by the Illegal Agreement, in which case the producer must continue to pay the dismissed director the minimum compensation due under the Illegal Agreement. *See* Ex. 3, Article III(F). This provision makes it financially disadvantageous for producers to hire replacement directors who are not parties to the unlawful conspiracy and thereby deprives producers, including Plaintiff, of the benefits of full and fair competition in the market for directorial services on first class theatrical productions on Broadway and elsewhere.

**E.     Defendants Agreed Among Themselves to Impose the Illegal Agreement Upon Plaintiff, and Continue to Do So**

39.     Defendants agreed among themselves to impose the provisions of the Illegal Agreement upon 8 Legged not only with respect to Taymor's services as director of the Musical, but also with respect to Taymor's services as collaborator and mask designer, even though, as

discussed herein, Taymor performed those services as an independent contractor and

"collaborators" and "mask designers" are not even among the SDC's membership categories.

40.    Defendants have sought to impose the terms of the Illegal Agreement upon 8

Legged in a variety of ways, including, but not limited to, requiring 8 Legged to post a bond in

connection with Taymor and to make health and pension payments on her behalf.

41.    Defendants have also sought to require 8 Legged to post a bond with the SDC

with respect to Philip McKinley, the Musical's replacement director, and Chase Brock, the

Musical's new choreographer.  Upon 8 Legged's refusal to post these bonds, Defendant SDC

purported to commence arbitration proceedings under the Illegal Agreement to resolve the

disputes on behalf of McKinley and Brock.

42.    Similarly, Defendants have sought to impose the terms of the Illegal Agreement

upon 8 Legged by commencing the Illegal Arbitration on Taymor's behalf.

43.    By agreeing to initiate the Illegal Arbitration and otherwise seek to compel

8 Legged to comply with the terms of the Illegal Agreement, Defendants have engaged in, and

given effect to, a horizontal conspiracy in restraint of trade.

44.    Upon information and belief, Defendant SDC routinely enters into and

coordinates agreements with and among other independent contractors to impose the terms of the

Illegal Agreement upon producers of first class theatrical productions on Broadway and

elsewhere with respect to the services of collaborators and others, in addition to directors, on

those productions.

**F.   Defendants' Conspiracy to Enforce the Illegal
Agreement Is Not Immune from the Antitrust Laws**

    **a.   Neither 8 Legged nor its Predecessors Agreed to be Bound by the Illegal
Agreement**

45.    8 Legged is not, and never has been, a member of the Broadway League or its predecessor, the League of American Theatres and Producers.

46.    8 Legged has never executed the Illegal Agreement and has not agreed to be bound by it.

    **b.   Taymor Is an Independent Contractor Whose Work is Not Subject to U.S.
Labor Laws**

47.    Under the NLRA, subject to certain exceptions not relevant here, a union such as the SDC may only represent, and bargain on behalf of, a lawfully established *bargaining unit* consisting of the employer's *employees*. 29 U.S.C. §§ 152 and 159. Section 2(3) of the NLRA expressly excludes any independent contractor from the definition of "employee." 29 U.S.C. § 152(3).

48.    Taymor was not an employee of 8 Legged or the Musical, but rather was an independent contractor. The Term Sheet states that "Taymor will have the following approvals (not to be unreasonably withheld) with respect to each production of the Musical directed by her...:

    (a) the entire original cast

    (b) replacements of the principal members of the cast

    (c) the stage manager;

    (d) the scenic designer and the designs and models for the sets

    (e) if Taymor is not engaged as the costumer (sic) designer, then the costume designer and the designs for the costumes;

(f) if Taymor is not engaged as the puppet designer, then the puppet designer and the puppet designs, if any;

(g) the sound designer and the sound designs;

(h) the choreographer;

(i) the orchestrator and arrangers;

(j) the conductor;

(k) casting agents;

(l) music supervisor;

(m) lighting designer;

(n) assistant director and all replacements;

(o) Broadway theater;

(p) West End theater; and

(q) Bookwriter/treatment writer and/or co-bookwriter/co-treatment writer…[and]…the show logo and master advertising artwork."

*See* Exhibit 1 at ¶ 7.

49. Taymor's status as an independent contractor who was hired to serve in the skilled occupation of the Musical's director is evident from the fact that Taymor admittedly claims that she controlled the manner and means by which she devised and implemented the direction of the Musical. Taymor and the SDC, in fact, have trumpeted Taymor's control over the production, claiming that Taymor was fully within her rights to refuse to implement the producers' requests for changes to the direction of the show.

50. The SDC's key witness at the Illegal Arbitration, Taymor's attorney Seth Gelblum, corroborated Taymor's status as an independent contractor when he testified under

oath that 8 Legged could not change any of Taymor's decisions concerning the Musical and that the Musical producers' only recourse with respect to Taymor's decisions was to fire her or refuse to pay.

51.     Moreover, Taymor's remuneration for her work on the Musical is tied, in substantial part, to the commercial success of the Musical in the form of net profit participations, royalties, and subsidiary rights.  See Exhibit 1, at ¶¶ 2-5.  Taymor was not paid a weekly or annual salary, nor did she receive overtime or vacation pay and was not treated as an employee for the purposes of compensation or taxes.

52.     Consistent with her role as independent contractor, Taymor decided when, where, how, and how long to work, and made clear to the Musical's producers, including Plaintiff, that she did not have to accept any additional work from them.  Indeed, during the seven (7) years of her involvement with *Spider-Man*, Taymor did not work exclusively on the Musical but, rather, worked on a wide variety of outside projects, including directing two operas (*The Magic Flute* in 2005 and *Grendel* in 2007), serving as a production consultant and designer for the 2009 Michael Jackson live concert show *This Is It*, and directing two motion pictures (*Across the Universe* in 2007 and *The Tempest* in 2010).  In fact, Hello Entertainment had to make a substantial payment to the producers of *The Tempest* so that Taymor could be available to continue to work on the Musical.

53.     Taymor also played a number of additional roles with respect to the Musical that are consistent with her status as an independent contractor.  With respect to a joint venture agreement whose stated purpose was "to produce and present the Musical throughout the world...," Taymor was one of six members of the board that was responsible for the joint venture's "major decisions," including those relating to raising capital, the engagement of

additional production companies, casting, broadcast rights, major marketing decisions, stock or amateur licensing deals, sale of the production's material assets, and the selection and financing of the theater for the performance of the Musical.

54.     Similarly, Taymor was contracted to be the Musical's co-bookwriter.  Her co-bookwriter agreement provided that, had she performed her duties as co-bookwriter, she would have received, in addition to her compensation as director and collaborator, a share of the production's profits and certain royalties from future productions of the Musical.

55.     In addition, Taymor's remuneration for her services on the Musical did not affect, directly or indirectly, the wages, hours, or working conditions of any employee of 8 Legged or the Musical.  Thus, any dispute between Taymor and 8 Legged concerning Taymor's work on the Musical, including Taymor's compensation for that work, is not a "labor dispute" within the meaning of *American Federation of Musicians v. Carroll*, 391 U.S. 99 (1968).

56.     Despite Taymor's status as an independent contractor and the lack of a lawful basis for the SDC to represent Taymor as part of a legitimate bargaining unit, Defendants agreed among themselves to impose, and did jointly impose, the Illegal Agreement upon Plaintiff and its predecessors as a necessary precondition to Taymor being retained for the Musical.  Defendants' conduct was thus an unlawful pre-hire agreement under the NLRA.

57.     Because (a) Taymor is and, with respect to the Musical, was an independent contractor, (b) no lawful collective bargaining relationship exists between 8 Legged and the SDC with respect to Taymor's work on the Musical, (c) the dispute between Defendants and 8 Legged with respect to Taymor's compensation on the Musical is not a "labor dispute" under the NLRA, and (d) Taymor's work on the Musical falls outside the purview of the NLRA, Defendants' conduct with respect to 8 Legged and the Musical is not immune from antitrust liability.

58.     Similarly because, on information and belief, Defendant SDC routinely imposes the Illegal Agreement upon producers of first class theatrical productions with respect to the services of independent contractors under circumstances substantially similar to those described herein with respect to the Musical and Taymor, Defendant SDC's conduct with respect to such other first class theatrical productions is not immune from antitrust liability.

F.      **Antitrust Injury Arising From Defendants' Horizontal Agreement to Impose the Illegal Agreement's Terms on 8 Legged.**

59.     As a purchaser of theater director and collaborator services, and of Taymor's services in particular, 8 Legged has been and, unless Defendants' conduct is stopped, will continue to be, directly injured by the restraints on competition effected by the Illegal Agreement and Defendants' unlawful conspiracy.  In particular, 8 Legged has been, and may continue to be, injured by Defendants' conspiracy to fix compensation minimums, royalty floors, health and pension benefits and other contributions, future income streams, subsidiary rights, and per diem contributions to be paid by 8 Legged to Taymor, or on her behalf, in connection with Taymor's services on the Musical, and by being compelled to participate in the Illegal Arbitration.  This injury flows directly from Defendants' unlawful restraint on competition among independent contractors who offer directorial, collaborator, and other services to producers, including Plaintiff, of first class theatrical productions on Broadway and elsewhere.  It is therefore antitrust injury.

**FIRST CAUSE OF ACTION**
**Combination or Conspiracy in Restraint of Trade - 15 U.S.C. § 1**
**(As Against All Defendants)**

60.     Plaintiff incorporates by reference the allegations in Paragraphs 1 through 59 above as if expressly realleged herein.

61.     Through the conduct described herein, Defendants entered into and engaged in a continuing combination and conspiracy to exclude competitors from the market for directorial services on first class theatrical productions on Broadway and elsewhere, and to increase, fix, stabilize, or maintain the price of directorial services for those productions, including Taymor's services as director of the Musical, which constitutes an unreasonable restraint of trade and commerce in per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

62.     As a result of Defendants' unlawful conspiracy:

a.  Price competition in the sale of Taymor's services to 8 Legged has been restrained, suppressed, and eliminated;

b.  Prices for Taymor's services have been raised, fixed, maintained, and/or stabilized at artificially high and noncompetitive levels;

c.  8 Legged has been deprived of the benefit of free and open competition; and

d.  8 Legged has been compelled to participate in the Illegal Arbitration.

63.     8 Legged has been injured in its business and property by reason of Defendants' antitrust violations in amounts not yet ascertained.  8 Legged's injury as a direct purchaser of Taymor's services is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants acts unlawful.

64.     8 Legged is threatened by continuing loss and damage as a result of Defendants' unlawful conduct, including, without limitation the progress of the Illegal Arbitration, entitling 8 Legged to injunctive relief.

## SECOND CAUSE OF ACTION
### Combination or Conspiracy in Restraint of Trade - 15 U.S.C. § 1
### (As Against All Defendants)

65.     Plaintiff incorporates by reference the allegations in Paragraphs 1 through 64 above as if expressly realleged herein.

66.    Through the conduct described herein, Defendants entered into and engaged in a continuing combination and conspiracy to increase, fix, stabilize, or maintain the price of Taymor's services as collaborator and mask designer on the Musical, which constitutes an unreasonable restraint of trade and commerce in per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

67.    As a result of Defendants' unlawful conspiracy:

a.    Price competition in the sale of Taymor's services to 8 Legged has been restrained, suppressed, and eliminated;

b.    Prices for Taymor's services have been raised, fixed, maintained, and/or stabilized at artificially high and noncompetitive levels;

c.    8 Legged has been deprived of the benefit of free and open competition; and

d.    8 Legged has been compelled to participate in the Illegal Arbitration.

68.    8 Legged has been injured in its business and property by reason of Defendants' antitrust violations in amounts not yet ascertained.  8 Legged's injury as a direct purchaser of Taymor's services is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants acts unlawful..

69.    8 Legged is threatened by continuing loss and damage as a result of Defendants' unlawful conduct, including, without limitation the progress of the Illegal Arbitration, entitling 8 Legged to injunctive relief.

### THIRD CAUSE OF ACTION
**Declaratory Judgment – 28 U.S.C. § 2201**
**(As Against All Defendants)**

70.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through [XXX] above as if expressly realleged herein.

71.    Plaintiff seeks a Declaratory Judgment that:

a. In her capacity as director on the Musical, Defendant Taymor was not an employee of 8 Legged or the Musical, but rather an independent contractor;

b. In her capacity as collaborator on the Musical, Defendant Taymor was not an employee of 8 Legged or the Musical, but rather an independent contractor;

c. In her capacity as mask designer on the Musical, Defendant Taymor was not an employee of 8 Legged or the Musical, but rather an independent contractor;

d. Defendant SDC is not the lawful representative of any employees of the Musical or with respect to any person's work on the Musical, including Taymor;

e. Defendants' efforts to impose the Illegal Agreement upon 8 Legged, including without limitation by pursuing the Illegal Arbitration, are an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

f. The Illegal Arbitration is unlawful, null, and void; and

g. With respect to 8 Legged and the Musical, the Illegal Agreement is null and void.

## PRAYER FOR RELIEF

**WHEREFORE**, 8 Legged prays that:

1. This Court declare, adjudge, and decree that Defendants have committed the violations of federal law alleged herein;

2. This Court declare that, in her capacity as director on the Musical, Defendant Taymor was not an employee of 8 Legged or the Musical, but rather an independent contractor;

3. This Court declare that, in her capacity as collaborator on the Musical, Defendant Taymor was not an employee of 8 Legged or the Musical, but rather an independent contractor;

4.      This Court declare that, in her capacity as mask designer on the Musical, Defendant Taymor was not an employee of 8 Legged or the Musical, but rather an independent contractor;

5.      This Court declare that Defendant SDC is not the lawful representative of any employee of the Musical or with respect to any person's work on the Musical, including Taymor;

6.      This Court declare that Defendants' efforts to impose the Illegal Agreement upon 8 Legged, including without limitation by pursuing the Illegal Arbitration, are an unreasonable restraint on trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

7.      This Court declare that, with respect to 8 Legged and the Musical, the Illegal Agreement is null and void;

8.      This Court declare that the Illegal Arbitration is unlawful, null and void;

9.      This Court issue an injunction, in accordance with Section 16 of the Clayton Act, 15 U.S.C. § 26, preventing and restraining the arbitrator from issuing a decision in the Illegal Arbitration;

10.     This Court issue an injunction, in accordance with Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Defendants from engaging in conduct similar to that alleged in this Complaint and that constitutes a present, continuing, or future unlawful agreement, combination, or conspiracy in restraint of trade and in violation of the antitrust laws, and in practices that facilitate those violations;

11.     This Court award Plaintiff full compensation for the damage it has sustained from each Defendant on each of Plaintiff's Claims for Relief, in an amount to be determined at trial, to be trebled according to law, plus interest, attorneys' fees and costs of suit; and

12.     This Court grant such other and further relief as it may deem just and proper.

## **JURY DEMAND**

8 Legged demands a trial by jury of all issues so triable by right to a jury.

Dated: New York, New York
       January 17, 2012

               DLA PIPER LLP (US)

               By: _____

               Paolo Morante (SDNY No. PM 1017)
               paolo.morante@dlapiper.com
               1251 Avenue of the Americas
               New York, New York  10020
               Tel.:   (212) 335-4813
               Fax:   (212) 884-8713

               *Attorneys for Plaintiff 8 Legged Productions, LLC*

# Exhibit 1

July 12, 2005

**Spider-Man Musical**

Summary of Material Terms Between LOH, Inc. ("Lender") f/s/o Julie Taymor ("Taymor" or "Director") and Hello Entertainment, LLC ("Hello" or "Producer").

The summary of material terms set forth below, when countersigned by Lender and Hello, outlines material terms upon which the parties have agreed Taymor will direct and collaborate on the creation of a dramatico-musical work for the legitimate stage presently entitled "Spider-Man: A Musical Web" (the "Musical") and grant Hello the right to produce and present the Musical.

The parties acknowledge that Hello entered into an agreement with Marvel Enterprises, Inc. dated March 25, 2004 (the "Marvel Agreement") pursuant to which Hello has acquired the right to cause to be created a stage musical based on certain intellectual property owned by Marvel (including the comic book character known as Spider-Man), which intellectual property is defined in the Marvel Agreement as the "Work".

1) **Fee**: In consideration for the Lender furnishing the direction and collaboration services of Director for the initial first class production of the Musical on Broadway in New York City or on the West End of London (in either case, the "Initial First Class Production") and any developmental productions prior to the opening of the Initial First Class Production, Hello will pay Lender a non-recoupable total fee of $125,000 (the "Fee").

   Upon the execution of this deal memo, Hello shall pay Lender $25,000 of the Fee ($12,500 of which has already been paid). The additional payments for the remainder of the Fee will be in three equal payments with the payment schedule to be negotiated in good faith between the parties.

2) **Net Profit Participation**: With respect to each company of the Musical produced or licensed by Hello, Lender will receive 2.5% of 100% of net profits of each such company, if any.

3) **Broadway Royalties**: Lender shall be entitled to the following royalties from performances of the Broadway production of the Musical:

   a. **Royalty as Director**: a minimum guaranteed weekly advance (to be negotiated in good faith) against 6.5% of Weekly Operating Profit pre-recoupment increasing to 7.4274% post recoupment.

   b. **Royalty as Collaborator**: a minimum guaranteed weekly advance (to be negotiated in good faith) against 2.5933% of Weekly Operating Profit pre-recoupment increasing to 2.9633% post recoupment.

   c. **Amortization**: The above royalty percentages will be subject to any pre-recoupment amortization and reduction schedules as agreed by Lender and all of the other creative parties.

4) **Royalties for Other Productions and Right of Lender to Furnish the Services of Director**: In the event Hello or any affiliate of Hello or of a controlling party of Hello produces, presents or licenses any first-class production of the Musical outside of Broadway, Lender will be given the first opportunity to furnish the services of Director to direct

**CONFIDENTIAL**                          **SDC 00096**

sums provided she has directed the Initial First Class Production of the Musical. If Taymor directs, Lender shall be entitled to a director royalty for such productions in an amount to be negotiated in good faith taking into account the financial needs of such productions, the prominence of Director, the standards in the theater industry and other relevant circumstances including the venue, provided, however, that Hello may calculate the royalties for any touring production of the Musical on a "company share" basis when Producer is paid on such basis; and provided further that Lender, in relation to authors, shall receive royalty treatment with regard to such productions on a proportionate basis to the royalties received by Lender and the authors on Broadway. Unless an agreement is reached with Lender with respect to such royalty for any performance of the Musical, Producer will have no right to use Director's directorial contribution to the Musical for such performance. Further, Lender must agree to any reductions, deferrals, waivers or other calculations of the foregoing royalties, and of the royalty set forth in paragraph 3. If Lender declines to furnish the services of Director to direct any such additional company referred to above, Producer will be entitled to deduct from the aforesaid royalty payable to Lender, an amount equal to the royalty paid by Producer to any replacement director who actually re-stages such company. The royalty so paid to the replacement director will not reduce Lender's royalty by more than thirty percent (30%).

5)  **Subsidiary Rights:** Per the current verbal agreement of Neil Jordan, Glen Berger and Bono and Edge of U2 (together, "Authors"), 1/7th of overall author's subsidiary rights participation, net of customary agency commissions and other third party participations, will go to Lender. In addition, Lender shall be entitled to 2.5% of gross retail sales (less only taxes) of any merchandise using any of Taymor's designs that Taymor is specifically hired to create for the Musical (i.e., costume or puppet designs, to the extent that she is a costume or puppet designer). No royalty shall apply, however, to use of the show logo, key art, the design used on the windowcard or the cover of the souvenir book regardless whether such was designed by Taymor.

6)  **Film:** To the extent that Hello has control over same, Hello agrees that it will accord Taymor the right of first refusal to direct a film version of the Musical, subject to her good faith negotiation with the appropriate entities. Hello will also cause Sony and the Authors to agree to the same. Taymor acknowledges and agrees that insofar as she is concerned Sony Entertainment, Inc. shall have a right of first negotiation and last refusal regarding a film adaptation of the Musical.

7)  **Approvals:** Taymor will have the following approvals (not to be unreasonably withheld) with respect to each production of the Musical directed by her, subject also to the approval of Hello, the Authors and Marvel (where applicable):

  (a)  the entire original cast;
  (b)  replacements of the principal members of the cast;
  (c)  the stage manager;
  (d)  the scenic designer and the designs and models for the sets;
  (e)  if Taymor is not engaged as the costumer designer, then the costume designer and the designs for the costumes;
  (f)  if Taymor is not engaged as the puppet designer, then the puppet designer and the puppet designs, if any;
  (g)  the sound designer and the sound designs;
  (h)  the choreographer;
  (i)  the orchestrator and arrangers;

(j)   the conductor;
(k)   casting agents;
(l)   music supervisor;
(m)  lighting designer;
(n)   assistant director, and all replacements;
(o)   Broadway theater;
(p)   West End Theater; and
(q)   Bookwriter/treatment writer and/or co-bookwriter/co-treatment writer (Glen Berger is hereby approved) .

Hello also agrees to accord Taymor approval, not to be unreasonably withheld or delayed, with respect to the show logo and master advertising artwork for the Musical.

The parties will enter into a long form agreement which is within the terms allowed under the Marvel Agreement and which incorporates the above stated terms as well as other terms that are found in director/collaborator agreements, including terms regarding billing, fees and/or advances related to the right of first refusal to direct other first class companies, timing of approvals and expenses.

Agreed and acknowledged:

Hello Entertainment, LLC                              LOH, Inc. f/s/o Director/Collaborator

By: _____            By: _____
      Tony Adams                                             Julie Taymor

By: _____
      David L. Garfinkle

CONFIDENTIAL

SDC 00098

# Exhibit 2



# PRYOR CASHMAN LLP

New York | Los Angeles

7 Times Square, New York, NY 10036-6569  Tel: 212-421-4100  Fax: 212-326-0806      www.pryorcashman.com

**Ronald H. Shechtman**
Managing Partner

Direct Tel: (212) 326-0102
Direct Fax: (212) 798-6302
rshechtman@pryorcashman.com

June 9, 2011

<u>By Hand and Federal Express</u>

George Nicolau, Esq.
240 East 39th Street, Ste. 34G
New York, NY 10016-7209

Re:   Stage Directors and Choreographers Society
       And Spider-Man Broadway, LLC --
       "Spider-Man: Turn Off the Dark"

Dear Mr. Nicolau:

A grievance has arisen between the Stage Directors and Choreographers Society ("SDC") and Spider-Man Broadway LLC, the Producer of "Spider-Man: Turn Off the Dark" ("Spider-Man"). The Producer has adopted and incorporated the terms of the current collective bargaining agreement between the SDC and The Broadway League (the "League Agreement") into its agreements with SDC members, including Julie Taymor. Pursuant to Article XVI of the League Agreement you are one of the designated arbitrators, and we hereby submit this request for arbitration on behalf of the SDC.

The claim involves the failure and refusal of the Producer to pay to Julie Taymor, the Director of "Spider-Man," any royalties and compensation for the run of the production in violation of both the collective bargaining agreement and her individual contract as Director.

The SDC accordingly seeks as a remedy an accounting from the Producer sufficient to determine the precise amount of royalties and compensation due to Ms. Taymor; payment of all royalties and compensation due to Ms. Taymor, plus interest; a direction to continue payment of royalties and all other compensation due to Ms. Taymor as and when due, subject to the revocation of the license to use her direction in the event of continued non-payment; and such other relief as may be appropriate.

We are advising each party by copy of this letter that pursuant to the provisions of CPLR Section 7503(c), unless it applies to stay the arbitration within twenty (20) days after service of this notice, it will thereafter be precluded form objecting that a valid agreement to arbitrate was not made or has not been complied with and from asserting in court the bar of any limitation of time.

# PRYOR CASHMAN LLP

George Nicolau, Esq.
June 9, 2011
Page 2


Would you please advise us of your next available date for the hearing of the matter. I enclose a copy of the League Agreement for your reference.

We appreciate your attention to this matter.


Very truly yours,

Ronald H. Shechtman

RHS:pb
Enclosure
cc:      (Via Federal Express)


Spider-Man Braodway, LLC
c/o Alan Williams
Wasser Associates
1650 Broadway, Ste. 800
New York, NY 10019
212-307-0800

Dale M. Cendali, Esq.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
212-446-4846

Keith Halpern
Director of Labor Relations
The Broadway League
729 7th Avenue, 5th Fl
New York, NY 10019
212-764-1122

Laura Penn, Executive Director
Society of Stage Directors & Choreographers
1501 Broadway
New York, NY 10036

# Exhibit 3



STAGE
DIRECTORS AND
CHOREOGRAPHERS
SOCIETY

# BROADWAY

September 1, 2008—August 31, 2011

# The Broadway League
# and
# Stage Directors and
# Choreographers Society, Inc.

**COLLECTIVE BARGAINING AGREEMENT**

September 1, 2008–August 31, 2011

## TABLE OF CONTENTS

I.      RECOGNITION AND COVERAGE .................................................. 1
II.     MEMBERSHIP, FEES AND UNION SECURITY ................................ 4
III.    GENERAL PROVISIONS.......................................................... 5
IV.     FEES AND ROYALTIES ........................................................... 6
IV-A.   SHORT-TERM OR SPECIALTY CHOREOGRAPHY........................ 15
V.      TOURS AND OTHER COMPANIES ........................................... 20
VI.     CREDIT FOR PRIOR FEES....................................................... 31
VII.    WAIVER/REDUCTION OF ROYALTIES ...................................... 32
VIII.   DURATION OF OBLIGATION.................................................. 34
IX.     PENSION AND HEALTH......................................................... 35
X.      PER DIEM EXPENSES ........................................................... 36
XI.     DIRECTOR-CHOREOGRAPHER ............................................... 36
XII.    ELECTRONIC RIGHTS ........................................................... 37
XIII.   MEDIA AND PROMOTION .................................................... 39
XIV.    SUBSIDIARY RIGHTS ........................................................... 40
XV.     NO STRIKE, NO LOCKOUT .................................................... 41
XVI.    ARBITRATION OF DISPUTES.................................................. 42
XVII.   BILLING    ......................................................................... 44
XVIII.  PROPERTY RIGHTS .............................................................. 44
XIX.    ARTISTIC RIGHTS................................................................ 45
XX.     MAINTAINING THE QUALITY OF A PRODUCTION ...................... 46
XXI.    PRODUCER'S REPORTING REQUIREMENTS ............................... 47
XXII.   THE OBLIGATION OF PRODUCERS WITH SUMS OWING ............. 49
XXIII.  EXISTING RELATIONS ........................................................... 50
XXIV.   COMPLETE AGREEMENT ...................................................... 50
XXV.    SEPARABILITY..................................................................... 50
XXVI.   DURATION AND APPLICABILITY............................................. 51
SCHEDULE A— MINIMUM FEES AND ADVANCES ............................... 52
SCHEDULE A—MINIMUM FEES AND ADVANCES, CONTD...................... 53
SCHEDULE B:—FORM CONTRACT ................................................... 54
SCHEDULE C:—TOUR/OTHER COMPANY NOTIFICATION FORM ............. 55

THIS AGREEMENT is made as of the 1st day of September 2008, by and between The Broadway League  (hereinafter called the "League"), having its principal office at 226 West 47th Street, New York City, for and on behalf of itself and its present and future Producer members (hereinafter called the "Producers"), and the Stage Directors and Choreographers Society, Inc. (hereinafter called the "SDC"), having its principal office at 1501 Broadway, New York City, for itself and on behalf of Directors and Choreographers employed by members of the League on productions covered by this Agreement.

In consideration of the mutual covenants and conditions herein contained, the parties hereto do hereby agree as follows:

## I.    RECOGNITION AND COVERAGE

(A)    The Producers recognize the SDC as the representative of Directors and Choreographers employed in connection with any first-class theatrical production of the Producers performed in the United States.

(B)    A Producer is a person whose name is on the program as the presenter or co-presenter of the play or as a general partner of the producing partnership or as an officer of the producing corporation or as principal of a limited liability company.

(C)    A first-class theatrical production is a play (dramatic play, revue, musical or a combination thereof) presented on the speaking stage under a Producer's management in a first-class theatre, in a first-class manner with a first-class cast. A first-class theatrical production shall not include productions of the following type or nature:

(1)    Vaudeville-type shows;

(2)    Concert-type shows of which JACKIE MASON'S MUCH ADO ABOUT NOTHING, DAME EDNA: THE ROYAL TOUR and MINNELLI on MINNELLI, are illustrative;

(3)    Readings of which Dorothy Stickney in THE LOVELY LIGHT, John Gielgud in AGES OF MAN and DON JUAN IN HELL are illustrative;

(4)    Night clubs and theatre restaurants, but Las Vegas shows will be considered "first-class" where so classified by Actors' Equity as part of a road tour;

(5)    Ballets;

(6)    Symphonic and musical importations; and

(7)    In addition to the aforegoing any production not under jurisdiction of Actors' Equity Association shall not be considered to be a first-class theatrical production.

(D)    If a person is hired and/or billed as a Director or Choreographer for a vaudeville type show, a concert type show or a reading as set forth above in Sections (C)(1), (2) and (3), such person shall be required to become a member of the SDC as provided in Article II Section (A) below, and this Agreement shall apply.  In the event such person is employed for fourteen or fewer days of rehearsals and/or previews, or any part(s) of such days, such person shall be compensated as follows:

| | |
|---|---|
| Fee, Advance, Royalties | 50% of the amounts due under Article IV or V, whichever is applicable. |
| Pension | In accordance with Article IX Section (B) |
| Health Fund Contribution | $685 plus $25 per week for each week that such production runs, |

commencing six months
after its first paid public
performance.

(E)     In return for recognition of the SDC granted by the Producers (i.e., present and
future Producer members of the League) in connection with first-class theatrical
productions of the Producers performed in the United States, the SDC agrees
that it will not attempt to seek recognition from and/or to bargain with the
Producers, either individually or collectively, with respect to productions of the
types listed in Sections (C)( 1) through (7) above, except as set forth in the
exception contained in Section (D).  A theatrical production presented on the
speaking stage in other than a first-class theatre shall not be covered by this
contract.

(F)     It is agreed that this Agreement does not cover a Producer, not previously a
member of the SDC, when such a Producer is acting as a Producer-Director or a
Producer-Choreographer. No such Producer-Director or Producer-
Choreographer will be induced, coerced or otherwise required to become a
member of the SDC.  Any Producer-Director or Producer-Choreographer
previously a member of the SDC shall not qualify hereunder and shall remain a
member of the SDC pursuant to Article II of this Agreement.

(G)     In addition to the posting of bond required by Article XXII of this Agreement, a
Producer who is a member of the League shall be required to deposit with the
SDC $25,000 for each Director and $18,750 for each Choreographer employed
on a first-class production whenever the SDC shall determine that such a deposit
should be made.  Said determination shall be made at the discretion of the
SDC, but shall be based on the Producer's prior payment record or the
Producer's credit standing.  Any Producer covered by this Agreement who is not
a member of the League shall be required to deposit with the SDC a sum equal
to the minimum fee and advance of a Director and/or Choreographer,
whichever is applicable, before the commencement of rehearsals. The security

so deposited by a Producer may be used, in the discretion of the SDC, ten (10) days after the Producer shall have received written notice of default from the SDC, to pay fees, royalty payments, per diem, and/or health and pension payments. Whenever a Producer shall be required to make the foregoing deposits and does not do so, it will not be a violation of the Agreement for the SDC to direct its members to refrain from working for the said Producer, or for the affected Director and/or Choreographer to refrain from working for said Producer. In the event that a bond is required, the bond shall be posted no later than two (2) weeks prior to the first rehearsal.

## II.    MEMBERSHIP, FEES AND UNION SECURITY

(A)    The Producers agree that, as a condition of employment, any Director or Choreographer hired after the execution date of the Agreement will be required to join the SDC after the 30th day following his/her employment or the effective date of this Agreement, whichever is later. This 30-day grace period applies to the initial engagement of a Director or Choreographer contracted after the execution date or effective date of this Agreement, whichever is later. Thereafter, with respect to succeeding engagements, Directors and Choreographers, as a condition of employment, shall be or become members of the SDC when hired by a Producer; provided, however, that nothing in this Section shall be construed to require the Producer to cease employing or refrain from employing any such person if the Producer has reasonable grounds for believing that:

(1)    Membership in the SDC was not available to him/her on the same terms and conditions generally applicable to other members; or

(2)    Membership in the SDC was denied or terminated for reasons other than his/her failure to tender the periodic dues and the initiation fee uniformly required by the SDC as a condition of acquiring or retaining membership.

4

(B)     The SDC agrees to admit to membership on non-discriminatory terms any present or future employee of the Producers.  Moreover, the SDC will not invoke any Federal statute or other laws or take any other action to bar alien Directors and/or Choreographers from the United States and will admit alien Directors and/or Choreographers to membership on a non-discriminatory basis.

(C)     The SDC agrees that any initiation fee, or charge similar thereto, shall be reasonable and shall be uniformly required of all applicants and members.

(D)     The Producer shall check off dues and remit same to the SDC, provided the Director and/or Choreographer has duly authorized such check off.

(E)     The SDC will establish such by-laws as will provide for honorable withdrawal and re-entry upon reasonable conditions. In no event will honorable withdrawal be conditioned on the payment by any individual of more than dues arrearages and in no event will honorable re-entry be conditioned on the payment by any individual of a sum in excess of the initiation fee set forth in Section (C) of this Article.

## III.   GENERAL PROVISIONS

(A)     The SDC shall be notified within forty-eight (48) hours of the engagement of a Director and/or Choreographer. No Producer may make any representation regarding the engagement of a Director and/or Choreographer unless negotiations for an agreement for his/her services has been completed.

(B)     The applicable provisions of this Agreement shall be deemed incorporated in the individual contract of employment between each Producer and each Director and/or Choreographer. The Producer, SDC, and the individual Director and/or Choreographer shall each be bound thereby.

(C)     Nothing contained in this Agreement shall be construed to prevent any Director or Choreographer from negotiating with and obtaining from any Producer any

better terms and conditions than are provided for in this Agreement without limitation.

(D)   The SDC will not enter into any first-class agreement with any person, firm or corporation, which provides more favorable terms to the Producer than those contained in this Agreement.

(E)   It is agreed that the direction of "musical numbers" is a usual part of the duties of a Director and/or Choreographer and that compensation for such direction is included in the minimum fee and royalty provisions of this Agreement.

(F)   No Director and/or Choreographer may be dismissed, except where the Director and/or Choreographer is guilty of breach of contract, without the full payment for all compensation due him/her under the contract as the same accrues. Notwithstanding the foregoing, if a Director and/or Choreographer is dismissed for any reason other than breach of contract and if the Producer hires another Director and/or Choreographer covered under this Agreement to succeed the dismissed Director and/or Choreographer, the Producer may reduce all fees, royalties and other payments due to the dismissed Director and/or Choreographer to the minimum terms provided herein. A dismissed Director and/or Choreographer shall be deemed to have elected not to direct or choreograph any additional companies under Article V Section (G).

(G)   The Producer will execute a standard form contract (See Schedule B) for employment of all Directors and/or Choreographers for all covered productions and file such contract and all riders with the SDC by the first rehearsal.

## IV.   FEES AND ROYALTIES

(A)   Fees

(1)   The applicable minimum fees and royalty advances for Directors and Choreographers shall be no less than those listed in Schedule A, attached hereto. The advance against royalties shall be considered part of the fee

for all purposes under this Agreement and is non-returnable.  The applicable fee and advance shall be determined as of the date of contract signing or date of first rehearsal, whichever is later.

(2)     Twenty-five (25%) percent of the contractual fee is to be paid directly to the Director and/or Choreographer on signing of the contract and is nonreturnable. The balance of the fee is payable in three (3) equal payments at the beginning of the first, second, and third weeks of rehearsal or not later than one (1) week before the first performance whichever is sooner. If a production is abandoned, there shall be no liability for fee payments due the Director and/or Choreographer after the date of the abandonment.  Those fees accrued to the Director and/or Choreographer prior to the abandonment may be retained by him/her and will be paid to him/her.

(B)    Royalties

(1)    Musicals

The Producer will pay to the Director and/or Choreographer of a musical either:

(a)    Royalties Based on Percentage of Gross Weekly Box Office Receipts.

(i)      Director:

A minimum royalty of .75% of Gross Weekly Box Office Receipts.

(ii)     Choreographer:

A minimum royalty of .50% of Gross Weekly Box Office Receipts.

(iii)    Notwithstanding the foregoing, when Gross Weekly Box Office Receipts are 120% of Weekly Breakeven or less (the "Grey Zone"), the Director will be paid a minimum of 1)

$945 (effective July 1, 2010, $975;, plus 2) 4% of the Net Operating Profit, if any, between 100% and 120% of Weekly Breakeven, with a cap on payments of .75 of Gross Weekly Box Office Receipts; and the Choreographer will be paid a minimum of 1) $475 (effective July 1, 2010, $490;), plus 2) 2.5% of the Net Operating Profit, if any, between 100% and 120% of Weekly Breakeven, with a cap on payments of .50% of  Gross Weekly Box Office Receipts.

OR

(b)   Royalties Based on Percentage of Net Operating Profit.  Whenever a Producer compensates the Director and/or Choreographer under this subsection "(b)," nothing in this Agreement shall preclude any method or form (including, without limitation, royalty pools) for determining the royalties due to a Director and/or Choreographer, provided that the Director and/or Choreographer receives the following minimum payments:

(i)   Director:

The greater of 1) 2.5% of weekly Net Operating Profit until 125% of recoupment, and 2.75% of weekly Net Operating Profit thereafter; or 2) a minimum weekly guarantee of $1,260. Effective July 1, 2010, the minimum weekly guarantee shall increase to $1,300;

(ii)   Choreographer:

A Choreographer will receive the greater of 1) 1% of weekly Net Operating Profit until 125% recoupment, and 1.1% of weekly Net Operating Profit thereafter; or 2) a minimum weekly guarantee of $630.  Effective July 1, 2010, the minimum weekly guarantee shall increase to $650.

(iii) Notwithstanding the above, royalties based on Net Operating Profit shall be capped at $4,510 per week for the Director and $2,255 per week for the Choreographer until recoupment. Effective July 1, 2010, the cap for a Director shall increase to $4,645 per week; and for a Choreographer, to $2,325 per week.

(2) Dramatic Productions

The Producer will pay to the Director of a dramatic production either:

(a) Royalties Based on Percentage of Gross Weekly Box Office Receipts.

 (i) A minimum royalty of 1.5% of Gross Weekly Box Office Receipts.

 (ii) Notwithstanding the foregoing, when Gross Weekly Box Office Receipts are 110% of Weekly Breakeven or less (the "Grey Zone"), the Director will be paid a minimum of 1) $630 (effective July 1, 2010, $650), plus 2) 7.5% of the Net Operating Profit, if any, between 100% and 110% of Weekly Breakeven, with a cap on payments of 1.5% of Gross Weekly Box Office Receipts.

**OR**

(b) Royalties Based on Percentage of Net Operating Profit.

 (i) Whenever a Producer compensates a Director under this subsection "(b)," nothing in this Agreement shall preclude any method or form (including, without limitation, royalty pools) for determining the royalties due to a Director, provided that the Director receives the following minimum payment: the greater of 1) 3.5% of weekly Net Operating Profit until 125% of recoupment, and 3.85% of weekly Net Operating Profit thereafter; or 2) a minimum weekly

guarantee of $920. Effective July 1, 2010, the minimum weekly guarantee shall increase to $950.

(ii)    Notwithstanding the above, royalties based on Net Operating Profit for a dramatic production shall be capped at $3,370 per week until recoupment. Effective July 1, 2010, the cap for a Director shall increase to $3,470 per week

(3)    Method of Calculating Royalties

If the Director's and/or Choreographer's contract includes a formula for calculating royalties under a Net Operating Profit basis pursuant to Sections (B)(1)(b) or (B)(2)(b), unless otherwise agreed, royalties may be calculated on a Net Operating Profit basis at any time at the option of the Producer.  Once begun, however, Sections (B)(1)(b) or (B)(2)(b) shall govern the royalty payments for the remaining life of the production.

(4)    Amortization

A Producer may utilize amortization as a variable in any royalty pool or other royalty payment formula, provided that the minimum compensation due under the collective bargaining agreement is paid to the Director and/or the Choreographer before taking amortization into account.   The following are examples of the manner in which a Producer may use amortization in the calculation of royalties under Article IV (B):


Royalties Based on Net Operating Profit


Assume that the contract of a Director of a musical provides for a royalty payment of 3% of the weekly net operating profit and that weekly amortization is $50,000 and that all other terms of the collective bargaining agreement apply.

In week number 10, the net operating profit equals $150,000. Under the Director's contract, after subtracting amortization from net operating profit, the Director is entitled to 3% of $100,000 (or $3,000). However, under the collective bargaining agreement, the Director must receive a minimum of 2.5% of $150,000 (or $3,750). In that week, therefore, the Producer must pay the Director $3,750

In week number 12, the net operating profit equals $250,000. Under the Director's contract, after subtracting amortization from net operating profit, the Director is entitled to 3% of $200,000 (or $6,000). Under the collective bargaining agreement, the Director would receive a minimum of 2.5% of $250,000 (or $6,250) unless that compensation exceeds the pre-recoupment cap as set forth in Article IV Section (B)(1)(b)(iii) [4,510; $4,645 as of 7/1/10]. Thus, because both these amounts exceed the $4,510 ($4,645 as of 7/1/10) pre-recoupment cap on net operating profit royalties, the director would receive $4,510 in week number 12.

Royalties Based on Percentage of Gross Weekly Box Office Receipts

Assume that the contract of a Director of a musical provides for a royalty payment of 1% of gross weekly box office receipts and that weekly amortization is $200,000 and that all other terms of the collective bargaining agreement apply.

In week number 10, the gross weekly box office receipts were $700,000. Under the director's contract, after subtracting weekly amortization from the gross weekly box office receipts, the director is entitled to 1% of $500,000 (or $5,000). However, under the collective bargaining agreement, the director is entitled to a minimum of .75% of $700,000 (or $5,250). Therefore, in week number 10, the director must receive $5,250.

In week number 12, the gross weekly box office receipts were $900,000. Under the director's contract, after subtracting weekly amortization from the gross weekly box office receipts, the director is entitled to 1% of $700,000 (or $7,000). Under the collective bargaining agreement, the director must receive at least .75% of $900,000 (or $6,750). Therefore, in week number 12, the director would receive $7,000.

(C)     Advances

    (1)     Musicals

        (a)     Whenever a Producer compensates a Director and/or Choreographer pursuant to Section (B)(1)(a) (i.e., based on Gross Weekly Box Office Receipts), the advance shall be recouped from the first dollar of royalties payable to the Director and/or Choreographer; provided, however, that when Gross Weekly Box Office Receipts are 120% of Weekly Breakeven or less, the advance shall be recouped only from any weekly royalties above $945 (effective July 1, 2010, $975), payable to the Director, and any weekly royalties above $475 (effective July 1, 2010, $490), payable to the Choreographer.

        (b)     Whenever a Producer compensates a Director and/or Choreographer pursuant to Section (B)(1)(b) (i.e., based on Net Operating Profit), the advance shall be recouped only from any weekly royalties above $1,260 (effective July 1, 2010, $1,300 per week), paid to the Director, and any weekly royalties above $630 (effective July 1, 2010, $650), paid to the Choreographer.

    (2)     Dramatic Productions

        (a)     When a Producer compensates a Director pursuant to Section (B)(2)(a) (i.e., based on Gross Weekly Box Office receipts), the advance shall be recouped from the first dollar of royalties payable to the Director and/or Choreographer; provided, however, that

when Gross Weekly Box Office Receipts are 110% of Weekly Breakeven or less, the advance shall be recouped only from any weekly royalties above $630 (effective July 1, 2010, $650), payable to the Director.

(b)   When a Producer compensates a Director pursuant to Section (B)(2)(b) (i.e., based on Net Operating Profit), the advance shall be recouped only from any weekly royalties above $920 (effective July 1, 2010, $950), paid to the Director.

(3)   Except for the minimum weekly payments set forth above at Subsections (1) and (2) of this Section (C), no royalties shall be paid to a Director and/or Choreographer until the royalties due exceed the advance. Where the individual contract provides for a fee at or in excess of the combined fee and advance against royalties set forth above, no additional advance against royalties need be paid unless otherwise specifically provided in said individual contract.

(D)   Payment Cycle

(1)   Royalties calculated pursuant to Sections (B)(1)(a) and (B)(2)(a) shall be calculated weekly, except that they may, at the Producer's option, be calculated on a cycle not to exceed six (6) weeks during the Christmas/New Year's period.  Royalties calculated pursuant to Sections (B)(1)(b) and (B)(2)(b) shall be calculated and be based on a cycle not to exceed four (4) weeks, with the following exceptions: 1) the preview period through opening, not to exceed six (6) weeks; 2) the Christmas/New Year's period, not to exceed six (6) weeks; and 3) the period up to and including closing, not to exceed six (6) weeks. The cycles for the payment of royalties shall apply on a most favored nations basis for each production.

(2)   Royalties shall be paid no later than ten (10) days after the week or cycle for which they are due. The Producer shall provide the SDC with copies of weekly box office statements or their equivalents within seven (7) days

after the close of the week of the statements. Cycle reconciliation report and profit-loss statements, including itemization of operating expenses, shall be provided to SDC within forty-five (45) days of the last performance of the cycle.

(E)    Definitions

(1)    For purposes of calculating royalties, Gross Weekly Box Office Receipts shall be the gross box office receipts as evidenced by the statements prepared and signed by the theatre and the Producer after the following deductions:

(a)    All admission taxes levied by any governmental agency on gross receipts;

(b)    Pension and Health deductions exercised as a result of the New York City tax abatement program;

(c)    Theatre party commissions and discounts, and cut rate sales;

(d)    Subscription fees;

(e)    Actors Fund benefits;

(f)    Any deductions similar to the ones listed above.

(2)    Gross Weekly Box Office Receipts (as set forth above), Recoupment, Net Operating Profit, and Weekly Operating Expenses/Weekly Breakeven shall be defined consistent with standard theatrical accounting practices on a most favored nations basis.  The Producer shall operate each production as efficiently as possible in accordance with standard theatrical practices.

(3)    Notwithstanding the foregoing, an amount may be excluded from the Gross Weekly Box Office Receipts for the purpose of calculating royalties if it is collected pursuant to the terms of a lease, license or occupancy agreement between a theatre owner and producer, which agreement requires the collection of such amount as a specified supplemental

charge in addition to the ticket price (e.g., a restoration or facilities charge) and its payment to the theatre owner for the purpose of the maintenance or capital improvement of the theatre.  Such amount shall not exceed $2.00 in New York City Broadway theatres for the duration of this Agreement and through August 31, 2010.

## IV-A. SHORT-TERM OR SPECIALTY CHOREOGRAPHY

(A)    MUSICALS

(1)    In the case of Musicals for which a Director-Choreographer or Choreographer has been employed under this Agreement and receives at least the minimum fees and royalties provided for at Article IV Sections (A)(1) and (B)(1), the Producer may also employ one or more additional Choreographers and compensate each additional Choreographer as follows, according to the number of days or parts of any days prior to the first paid public performance (which days need not be consecutive) in which he or she shall be required to render any choreographic services ("Choreographic Work Days"):

(a)    Fees:

| Choreographic Work Days | Sept. 1, 2008-Aug. 31, 2009 | Sept. 1, 2009-Aug. 31, 2010 | Sept. 1, 2010-Aug. 31, 2011 |
|---|---|---|---|
| 1 through 6 | $640 per day | $655 per day | $670 per day |
| 7 through 13 | $9,505 | $9,695 | $9,935 |
| 14 through 21 | $14,265 | $14,550 | $14,915 |
| 22 or more | $19,020 | $19,400 | $19,885 |

(b)     Weekly Royalties

(i)     Losing Weeks

| Choreographic Work Days | Sept. 1, 2008-June 30, 2010 | July 1, 2010-Aug. 31, 2011 |
| --- | --- | --- |
| 1 through 6 | 0 | 0 |
| 7 through 13 | $185 | $190 |
| 14 through 21 | $250 | $260 |
| 22 through 27 | $310 | $320 |
| 28 or More on Gross | $460 | $475 |
| 28 or More on NOP | $620 | $640 |

A "Losing Week" is any week in which the Gross Weekly Box Office Receipts are less than the Weekly Operating Expenses/Weekly Breakeven.

(ii) Other Weeks

| Choreographic Work Days | Sept. 1, 2008-June 30, 2010 | July 1, 2010-Aug. 31, 2011 |
| --- | --- | --- |
| 1 through 6 | 0 | 0 |
| 7 through 13 | $210 | $215 |
| 14 through 21 | $310 | $320 |
| 22 through 27 | $395 | $405 |
| 28 or More on Gross | $465 | $480 |
| 28 or More on NOP | $625 | $645 |

(c)     Pension and health contributions shall be made in accordance with Article IV-A Section (C), below.

(2)     In the case of a musical production with a rehearsal period of four (4) weeks or more (exclusive of previews) and which requires only incidental choreography, the Producer, with the agreement of the Director, may engage a Short-Term Choreographer instead of a Choreographer employed under the terms of Article IV and/or V. Such Short-Term Choreographer shall be employed only for fourteen or fewer days, or any part(s) of such days, and compensated as follows:

| | |
|---|---|
| Fee, Advance, Royalties | 50% of the amounts due under Article IV or Article V, whichever is applicable. |
| Pension | In accordance with Article IX Section (B) |
| Health Fund Contribution | $685; plus $35 per week for each week that such production runs, commencing six months after its first paid public performance. |

(B)    DRAMATIC PRODUCTIONS

In the case of Dramatic Productions the Producer may employ a Choreographer and compensate him or her as follows, according to the number of days or parts of any days prior to the first paid public performance (which days need not be consecutive) in which the Choreographer shall be required to render any choreographic services ("Choreographic Work Days"):

(1)    Fees:

| Choreographic Work Days | Sept. 1, 2008-Aug. 31, 2009 | Sept. 1, 2009-Aug. 31, 2010 | Sept. 1, 2010-Aug. 31, 2011 |
|---|---|---|---|
| 1 through 6 | $385 per day | $395 per day | $405 per day |
| 7 through 13 | $4,850 | $4,945 | $5,070 |

| | | | |
|---|---|---|---|
| 14 through 21 | $8,325 | $8,490 | $8,700 |
| 22 through 27 | $11,790 | $12,025 | $12,325 |
| 28 or More | Minimum Fee and Advance for Choreographer specified at Schedule A Section 1. | | |

    (2)    Weekly Royalties:

        (a)    Losing Weeks

| Choreographic Work Days | Sept. 1, 2008- June 30, 2010 | July 1, 2010- Aug. 31, 2011 |
|---|---|---|
| 1 through 6 | 0 | 0 |
| 7 through 13 | $125 | $130 |
| 14 through 21 | $155 | $160 |
| 22 through 27 | $210 | $215 |
| 28 or More | Minimum terms specified under Article IV Section (B). | |

A "Losing Week" is any week in which the Gross Weekly Box Office Receipts are less than the Weekly Operating Expenses/Weekly Breakeven.

        (b)    Other Weeks

| Choreographic Work Days | Sept. 1, 2008- June 30, 2010 | July 1, 2010- Aug. 31, 2011 |
|---|---|---|
| 1 through 6 | 0 | 0 |
| 7 through 13 | $155 | $160 |
| 14 through 21 | $195 | $200 |
| 22 through 27 | $245 | $250 |
| 28 or More | Minimum terms specified under Article IV Section (B). | |

(C)     Except for circumstances provided for in Article IV-A Section (A)(2) above, the
        Producers shall make only the following initial contributions to the SDC/League
        Pension and Health Funds on behalf of Choreographers covered under this
        Article IV-A, except where weekly payments are also specified below:

| Choreographic Work Days | Health Fund |
|---|---|
| 1 through 6 | 0 |
| 7 through 13 | $655 |
| 14 through 21 | $655 |
| 22 through 27 | $655 |
| 28 or more | Musical: $1,350 |
| Dramatic Production: | Initial and Weekly Payments Per Article IX Section (B) |

| Choreographic Work Days | Pension Fund |
|---|---|
| 1 through 6 | 0 |
| 7 through 13 | 8% of Minimum Fee* |
| 14 through 21 | 8% of Minimum Fee* |
| 22 through 27 | 8% of Minimum Fee* |
| 28 or more | Musical: 8% of Minimum Fee* |
| Dramatic Production: | Initial and Weekly Payments Per Article IX Section (B) |

* "Minimum Fee" in this Section (C) refers to the applicable Minimum Fee set forth for
a Musical at Section (A)(1) of this Article IV-A, or for a Dramatic Production at Section
(B)(1) of this Article IV-A.

(D)     All fees and pension and health fund payments due under this Article IV-A shall
        be paid at such times as fees and fund payments are payable pursuant to Article
        IV Section (A) (2) and Article IX Section (C), respectively.

(E)     The provisions of this Article IV-A shall not apply to performers who
        choreograph dance sequences solely for themselves; but shall apply to a

performer who choreographs dance sequences for other performers, except that no contributions on behalf of such performer/choreographer shall be due to the Health Fund if the Producer is making payments to another labor-management health fund which is providing health insurance on behalf of such performer/choreographer.

## V.   TOURS AND OTHER COMPANIES

(A)   All productions or tours presented outside of New York City and covered under this Agreement shall be subject to the provisions of this Article, except as otherwise indicated.

(B)   All touring productions that meet the criteria of the Actors' Equity Association ("AEA") Tiered Tours, in effect as of September 1, 2008, may utilize the SDC Tiered Touring rates for fees and royalties, as set forth in subsections (C) and (D) below.  All touring productions that meet the criteria of the AEA Short Engagement Touring Agreement (SET), in effect as of January 5, 2009, may utilize the SET rates for fees and royalties, as set forth in subsections (C) and (D) below. As outlined in Article III, Section (D) above, the SDC shall not enter into any first-class agreement with any person, firm or corporation, which provides more favorable terms to the Producer than those contained in this provision.

(C)   Fees

    (1)   Fees for Tours Longer than Twelve (12) Weeks

        (a)   <u>Musical</u>

|  | Director | Choreographer |
|---|---|---|
| September 1, 2008 | $23,830 | $19,730 |
| September 1, 2009 | $24,305 | $20,125 |
| September 1, 2010 | $24,915 | $20,630 |

(b)  <u>Dramatic Production</u>

|  | <u>Director</u> |
|---|---|
| September 1, 2008 | $20,845 |
| September 1, 2009 | $21,260 |
| September 1, 2010 | $21,790 |

(2)  Fees for Tours of Twelve (12) Weeks or Fewer

    (a)  <u>Musical</u>

|  | Director | Choreographer |
|---|---|---|
| September 1, 2008 | $16,320 | $13,620 |
| September 1, 2009 | $16,645 | $13,890 |
| September 1, 2010 | $17,060 | $14,240 |

    (b)  <u>Dramatic Production</u>

|  | <u>Director</u> |
|---|---|
| September 1, 2008 | $13,845 |
| September 1, 2009 | $14,120 |
| September 1, 2010 | $14,475 |

(3)  Fees for Tiered Tours Longer than Twelve (12) Weeks

    (a)  <u>Musical</u>

|  | Director | Choreographer |
|---|---|---|
| September 1, 2008 | $19,065 | $15,785 |

| | | |
|---|---|---|
| September 1, 2009 | $19,445 | $16,100 |
| September 1, 2010 | $19,930 | $16,505 |

(b)   Dramatic Production

| | Director |
|---|---|
| September 1, 2008 | $16,675 |
| September 1, 2009 | $17,010 |
| September 1, 2010 | $17,435 |

(4)   Fees for Tiered Tours of Twelve (12) Weeks or Fewer

(a)   Musical

| | Director | Choreographer |
|---|---|---|
| September 1, 2008 | $13,055 | $10,895 |
| September 1, 2009 | $13,315 | $11,115 |
| September 1, 2010 | $13,650 | $11,395 |

(b)   Dramatic Production

| | Director |
|---|---|
| September 1, 2008 | $11,075 |
| September 1, 2009 | $11,295 |
| September 1, 2010 | $11,575 |

(5)     Fees for SET Tours

    (a)     Musical

|  | Director | Choreographer |
|---|---|---|
| January 1, 2010 | $17,000 | $13,600 |
| January 1, 2011 | $17,425 | $13,940 |

    (b)     Dramatic Production

|  | Director |
|---|---|
| January 1, 2010 | $14,800 |
| January 1, 2011 | $15,170 |

(6)     Twenty-five (25%) percent of the contractual fee is to be paid directly to the Director and/or Choreographer on signing of the contract and is nonreturnable. The balance of the fee is payable in three (3) equal payments at the beginning of the first, second, and third weeks of rehearsal or not later than one (1) week before the first performance, whichever is shorter. If a production is abandoned, there shall be no liability for fee payments due the Director and/or Choreographer after the date of the abandonment.  Those fees accrued to the Director and/or Choreographer prior to the abandonment may be retained by him/her and will be paid to him/her.

(7)     If a Tour is discontinued or suspended for six (6) weeks or more and the Director and/or Choreographer is required to participate in rehearsals, he/she shall be compensated as follows:

        Up to one (1) week:           No Fee

| | |
|---|---|
| More than one (1) week through three (3) weeks | 50% Minimum Tour Fee |
| In excess of three (3) weeks | 100% Minimum Tour Fee |

(D) Royalties for Tours and Other Companies

    (1) Royalties for Tours Longer than Twelve (12) Weeks

        (a)    The Director shall be paid a weekly minimum of 1) $1,550 (effective July 1, 2010, $1,595), of which $775 (effective July 1, 2010, $798) shall be a non-recoupable advance against any weekly Overage payment due for that week, plus 2) in the case of a musical, 2.5% of the weekly Overage, less one-half of the weekly advance; or in the case of a dramatic production, 3.5% of the weekly Overage, less one-half of the weekly advance.

        (b)    The Choreographer shall be paid a weekly minimum of 1) $1,240 (effective July 1, 2010, 1,275) of which $620 (effective July 1, 2010, $638) shall be a non-recoupable advance against any weekly Overage payment due for that week, plus 2) 1% of the weekly Overage, less one-half of the weekly advance.

    (2)    Royalties for Tours of Twelve (12) Weeks or Fewer

        (a)    The Director shall be paid a weekly minimum of 1) $1,490 (effective July 1, 2010, $1,535) of which $745 (effective July 1, 2010, $768) shall be a non-recoupable advance against any weekly Overage payment due for that week, plus 2) in the case of a musical, 2.5% of the weekly Overage, less one-half of the weekly advance; or in the case of a dramatic production, 3.5% of the weekly Overage, less one-half of the weekly advance.

(b)     The Choreographer shall be paid a weekly minimum of 1) $1,210 (effective July 1, 2010, $1,245) of which $605 (effective July 1, 2010, $623) shall be a non-recoupable advance against any weekly Overage payment due for that week, plus 2) 1% of the weekly Overage, less one-half of the weekly advance.

(3)     Royalties for Tiered Tours Longer than Twelve (12) Weeks

(a)     The Director shall be paid a weekly minimum of 1) $1,240 (effective July 1, 2010, $1,275) of which $620 (effective July 1, 2010, $638) shall be a non-recoupable advance against any weekly Overage payment due for that week, plus 2) in the case of a musical, 2.5% of the weekly Overage, less one-half of the weekly advance; or in the case of a dramatic production, 3.5% of the weekly Overage, less one-half of the weekly advance.

(b)     The Choreographer shall be paid a weekly minimum of 1) $990 (effective July 1, 2010, $1,020) of which $495 (effective July 1, 2010, $510) shall be a non-recoupable advance against any weekly Overage payment due for that week, plus 2) 1% of the weekly Overage, less one-half of the weekly advance.

(4)     Royalties for Tiered Tours of Twelve (12) Weeks or Fewer

(a)     The Director shall be paid a weekly minimum of 1) $1,190 (effective July 1, 2010, $1,225) of which $595 (effective July 1, 2010, $613) shall be a non-recoupable advance against any weekly Overage payment due for that week, plus 2) in the case of a musical, 2.5% of the weekly Overage, less one-half of the weekly advance; or in the case of a dramatic production, 3.5% of the weekly Overage, less one-half of the weekly advance.

(b) The Choreographer shall be paid a weekly minimum of 1) $970 (effective July 1, 2010, $1,000) of which $485 (effective July 1, 2010, $500) shall be a non-recoupable advance against any weekly Overage payment due for that week, plus 2) 1% of the weekly Overage, less one-half of the weekly advance.

(5) Royalties for SET Tours

(a) The Director shall be paid a weekly minimum of 1) $1,200 (effective January 1, 2011, $1,235) of which $600 (effective January 1, 2011, $618) shall be a non-recoupable advance against any weekly Overage payment due for that week, plus 2) in the case of a musical, 2.5% of the weekly Overage, less one-half of the weekly advance; or in the case of a dramatic production, 3.5% of the weekly Overage, less one-half of the weekly advance.

(b) The Choreographer shall be paid a weekly minimum of 1) $950 (effective January 1, 2011, $980) of which $475 (effective January 1, 2011, $490) shall be a non-recoupable advance against any weekly Overage payment due for that week, plus 2) 1% of the weekly Overage, less one-half of the weekly advance.

(6) "Overage" shall be defined as the amount paid to or earned by the Producer that exceeds:  1) the guarantee paid to the Producer, or 2) the weekly operating expenses plus Fixed Weekly Amortization until recoupment; whichever is greater. "Fixed Weekly Amortization" shall equal the capitalization costs of the tour or other company, divided by the number of weeks the tour or other company is initially booked to run (as determined no later than four weeks after the first paid public performance).

(7)     Provided that the Producer shall pay at least the minimum royalty set forth above, nothing in this Agreement shall preclude any method or form or any combination of methods or forms for determining the royalties due to a Director or Choreographer for a tour or other company. No advance of royalties is required for a tour or other company.

(E)     Broadway Production Performing Outside of New York

When a Broadway production performs in up to two (2) additional venues outside of New York after closing on Broadway and the Director and/or Choreographer is required to participate in rehearsals, he/she shall be compensated as follows:

| | |
|---|---|
| Up to one (1) week: | No Fee |
| More than one (1) week and up to two (2) weeks | 25% Minimum Tour Fee |
| More than two (2) weeks and up to three (3) weeks | 50% Minimum Tour Fee |
| In excess of three (3) weeks | 100% Minimum Tour Fee |

(F)     Tour or Other Company Moving to Broadway When a touring production or other company is presented on Broadway (which is not a pre-Broadway tryout, as currently defined by the collective bargaining agreement between the League and Actors' Equity Association), the provisions of Article IV shall apply to such production for the duration of its run on Broadway, except:

(1)     No fee shall be due when the rehearsal period, exclusive of the preview period, is one week or less; one-half of the fee set forth at Schedule A shall be due when the rehearsal period, exclusive of the preview period, is more than one week and up to three weeks; and the full fee set forth at

Schedule A shall be due when the rehearsal period, exclusive of the preview period, exceeds three weeks; and

(2)    The advance set forth at Schedule A shall be reduced by all weekly royalty payments, including the weekly minimum royalties, paid to the Director and/or Choreographer prior to the move to Broadway.

(G)    Other Companies

(1)    (a) Except as otherwise provided herein, the Director and/or Choreographer shall have the option to direct and/or choreograph all first-class companies presenting the play in the United States, Canada or the British Isles under the auspices of the Producer, or for which the Producer or an entity in which the producer is a participant may license the production rights; i.e., under the first-class production rights. The Director and/or Choreographer must make his/her election known to the Producer, in writing, within ten (10) days after receipt of written notice of an additional company from the Producer.

(b) Where a Producer produces a new Broadway production of a play or musical it previously produced without the use of the original work of the previous Director, Choreographer or Director-Choreographer, and with a new physical production, the Producer shall not be required to offer the Director,  Choreographer or Director-Choreographer the option to direct or choreograph the subsequent production.

(2)    (a)    Upon license of a production the Producer shall notify SDC within seventy-two (72) hours of the identity of the licensee and the production subject to the terms of this subsection 2.

(b)    In the event that the Director, Choreographer or Director-Choreographer negotiates terms that do not meet the minimum terms of the SDC/League Agreement, or the licensee fails to pay such fees, royalties, pension or health as may be due, the SDC shall have no right to proceed against the licensor/original Producer, provided timely notice of license has been given

pursuant to Section G(2)(a) above and a bond or letter of credit has been posted/provided under (G)(3) below.

(3)     A Producer shall satisfy its obligations under this Agreement in connection with a licensed production if the Producer either (a) notifies the licensee of all obligations under the SDC/League Agreement and any additional obligations under the individual employment agreement, and the licensee signs a security agreement and posts a bond in U.S. dollars (which may be in the form of a letter of credit from a U.S. bank) equal to the minimum fees (including advances) for such licensed production; or (b) guarantees all obligations of the licensed production.

(4)     If the Director and/or Choreographer elects to direct and/or choreograph such additional company or companies, he/she shall receive for each additional company directed and/or choreographed by him/her in the United States, Canada or British Isles, the tour fees, royalties and pension and health payments due under this Agreement therefore; provided that the Director and/or Choreographer is present for at least one-half of the rehearsals. If the original Director and/or Choreographer elects to direct and/or choreograph such additional company or companies and is present for at least 25% of the rehearsals but less than 50%, he/she shall receive no less than 50% of the minimum tour fees and 75% of the minimum tour royalties and 100% of the pension and health payments due therefor. If the original Director and/or Choreographer elects to direct and/or choreograph such additional company or companies but is present for less than 25% of the rehearsals, he/she shall not receive any fee, but will receive no less than 50% of the minimum tour royalties and 50% of the pension and health payments due therefor.  If the Director and/or Choreographer does not elect to exercise his/her option, he/she shall not receive any fee or pension and health payments in respect to such company, but will receive no less than 50% of the minimum tour royalties.

(5) When the Director and/or Choreographer does not elect to direct and/or choreograph an additional company or companies, the person chosen by Producer to reproduce the work shall be covered by the terms of this Agreement.  The restager shall receive no less than one-half (1/2) of the minimum tour fee and royalty and 100% of pension and health contributions.  The restager shall be responsible for brushup and/or maintenance on such companies.

(6) The Director and/or Choreographer shall also have the option to direct and/or choreograph any and all so-called stock companies presenting the play in the United States and Canada while the first-class company is still running on Broadway. If the Director or Choreographer makes such election, he/she shall receive no less than the fee and royalties applicable at the stock theatre based on the minimum basic agreement between that theatre and the SDC, or if no such agreement exists, then based on the applicable minimum basic SDC agreement, if any, determined by the agreement between the stock theatre and Actors' Equity Association.

(H) Other Venues

In the event that a touring production shall be presented substantially intact and as part of an ongoing tour in a venue covered by another SDC collective bargaining agreement (e.g., LORT, COST, et al.), the minimum tour fee, royalties and pension and health contributions due to the Director and/or Choreographer under this Agreement shall be made in lieu of any payments due under any other SDC collectively bargaining agreement, and the SDC shall forego and waive any claim for such other payments.

(I) Optional Compensation Arrangements

(1) The Producer shall have the option to pay fees, advances (if any) and royalties under Article IV or V hereof on any sit-down production (i.e., non-touring production) outside of New York City that opens after a Broadway production has been opened, which option must be elected prior to the commencement of rehearsals for such production.

(2)   In the event that such production referenced in Section I (1) above plays in a theatre of 500 seats or fewer, the Producer may pay 75% of any fee or advance otherwise due and 75% of the minimum flat weekly royalties otherwise due, against the minimum percentage royalty due under Article IV or V hereof (based on the election made under (I)(1) above).

## VI.   CREDIT FOR PRIOR FEES

(A)   If a foreign importation is brought over substantially intact, where the original direction and/or choreography was performed abroad, and where the Director and/or Choreographer is employed for rehearsal direction and/or choreography required to meet conditions on the American stage, the terms of this Agreement shall apply.  The Director and/or Choreographer shall receive no less than one-half (1/2) the minimum fee and advance and no less than the full minimum royalty percentage, and full weekly contributions shall be made to the Pension and Health Funds. However, if set forth in writing in the individual contract, the Director and/or Choreographer shall receive as fee the difference between the amount received abroad and one-half (1/2) the minimum fee required to be paid under this Agreement.

(B)   If a production not covered under this Agreement subsequently reopens as a production covered under this Agreement within one (1) year of the closing of the prior, uncovered production, the Producer shall be entitled to a credit of one-half (1/2) of the Director's and/or Choreographer's fee(s) paid for the prior, uncovered production.

(C)   If a Producer moves a production from any theatre within one (1) year of its closing and does not use the services of the original Director and/or Choreographer, the original Director and/or Choreographer shall be paid an amount equal to one-half (1/2) the minimum fee under this Agreement.  This Section shall not apply to a production covered under this Agreement which may move from one Broadway theatre to another.

## VII.   WAIVER/REDUCTION OF ROYALTIES

(A)   There shall be no need for SDC consent for any reduction in fees or royalties provided that the applicable minimums set forth in this Agreement are paid. Waiver by any Director or Choreographer of any of the terms of this Agreement below the minimum terms herein provided shall not be requested of the Director or Choreographer or be effective unless the consent of the SDC is first obtained; provided, however, a reduction of royalties below the applicable minimum for up to a maximum of any four (4) weeks (which need not be consecutive) may be made without the consent of the SDC, provided that an agreement, in writing, for such reduction be signed by the Producer and Director and/or Choreographer, and filed with the SDC within one (1) week after the reduction is agreed upon.

(B)   Prior to the conclusion of the last week of reductions of royalties below the minimum terms of this Agreement, a Producer may apply, the Director and/or Choreographer consenting, for the approval by the SDC of an extension of the reductions. The Producer shall specifically address: (i) how such extension will forseeably lead to the extension of the production beyond the extension of the waiver; and (ii) what revenue sources, if any, from the production will be made available to repay any extended waivers permitted by the SDC.  Such request will not be unreasonably denied. The SDC must act upon this request within three business days of receipt of the proper documentation.  In the event the extension is not approved by the SDC, or if a Producer fails to pay any royalties or pension or health payments which are due and has failed to follow the provisions of this Section of the Agreement, arbitration may be requested before any of the arbitrators named in Article XVI of this Agreement, and an arbitration may be held upon one (1) week's written notice to the other party.  In all other respects, the provisions of Article XVI shall govern the procedure for arbitration.

(C) Committee

In an effort to equip a dialogue between the Producer, the Director, the Choreographer, and their creative colleagues as to how to manage their project, and to try to find alternative mechanisms to accomplish this without simply "taking" royalty waivers, the SDC and the League shall create a standing committee to engage in dialogue and creative problem solving to explore new and mutually beneficial compensation structures.

The Committee shall be comprised of at least 3 and no more than 5 representatives from each side, not including staff, that shall meet every other month commencing January 2010 through and including the expiration of the parties' successor agreement.

This Committee shall be empowered by the bargaining parties to discuss any ideas brought to it, and shall do so in good faith and in the spirit of cooperation. The concepts the parties shall discuss include, but shall not be limited to,

- Alternative compensation models, including, but not limited to, increased reward commensurate with risk or diminution of compensation;
- expansion of cycles/alternatives to the traditional four and six-week cycle;
- deferral programs; and
- opportunities for Directors and Choreographers to be repaid amounts deferred and/or share in additional revenues earned by the production at a rate higher than that provided for in the parties' agreement.

The Committee has no jurisdiction or authority to determine waivers/deferrals. The Committee shall discuss current waiver/deferral proposals and SDC responses, with the understanding that the Producer shall be responsible for providing all details of such waiver/deferral requests to the League's Director of Labor Relations. Nothing herein is intended to modify this Article VII of the parties' Agreement.

The Committee members, once identified, shall commit to the Committee's meetings and process.  The Committee shall meet on a date certain selected by the parties every other month.

## VIII.  DURATION OF OBLIGATION

(A)     A maximum of eight (8) consecutive weeks in the case of a drama, and ten (10) consecutive weeks in the case of a musical, after the first public performance out of town, shall be the limit of the Director's and/or Choreographer's obligation prior to the New York opening.  The Director and/or Choreographer agree that, in cases where additional time is required during the out-of-town tryout beyond this period, he/she shall continue to function as the Director and/or Choreographer, provided he/she is available and uncommitted by virtue of any other professional engagement.

(B)     Should a production be suspended because of strike, lockout, fire, flood, act of the public enemy or act of God, the period of the suspension shall not be considered as part of the consecutive employment periods set forth in Section (A) above. The Director and/or Choreographer agree that in cases where a suspension of production occurs prior to the date the production opens in New York, he/she shall continue to function as the Director and/or Choreographer, provided he/she is available and uncommitted by virtue of any other professional engagements contracted for prior to said suspension.

(C)     Should the suspended production require additional directorial or choreographic services to bring it to completion, and should the Director and/or Choreographer be unable to continue because of such a prior commitment, his/her royalty schedule shall be as follows:

(1)     Production not in rehearsal - no royalties;

(2)     In rehearsal at least two weeks - one third (1/3) of royalties;

(3)     After out-of-town opening - two thirds (2/3) of royalties. Fees received up to the time of the suspension may be retained should a Director and/or Choreographer be prevented from continuing as set forth above.

## IX.   PENSION AND HEALTH

(A)     The parties agree to recognize a Pension Trust Fund and a Health Trust Fund for the purpose of providing pension and health benefits to the Directors and Choreographers employed by the Producer and other Producers. Said trust Funds shall be jointly administered and shall be established in accordance with all legal requirements.

(B)     The Producers shall make the following contributions to the Pension and Health Funds:

| Broadway | | Pension | Health |
|---|---|---|---|
| September 1, 2008 | Initial | 1,940 | 1,300 |
| | Weekly | 185 | 125 |
| September 1, 2009 | Initial | 1,980 | 1,400 |
| | Weekly | 190 | 145 |
| September 1,2010 | Initial | 2,030 | 1,400 |
| | Weekly | 195 | 150 |
| Tours and Other Companies | | Pension | Health |
| September 1, 2008 | Initial | 980 | 750 |
| | Weekly | 100 | 115 |
| September 1, 2009 | Initial | 1,000 | 750 |
| | Weekly | 102 | 130 |
| September 1, 2010 | Initial | 1,025 | 750 |
| | Weekly | 105 | 135 |
| Tiered & SET Tours | | Pension | Health |
| September 1, 2008 | Initial | 980 | 710 |
| | Weekly | 100 | 110 |

| September 1, 2009 | Initial | 1,000 | 710 |
| | Weekly | 102 | 125 |
| September 1, 2010 | Initial | 1,025 | 710 |
| | Weekly | 105 | 130 |

(1)   In the event that there is more than one production of a musical or dramatic production running simultaneously for which pension and health contributions are due hereunder, the original Director and/or Choreographer shall not be entitled to receive additional health fund contributions while he or she is receiving contributions from a prior production of the musical or dramatic production.

(C)   Weekly contributions to the Pension and Health Funds shall be paid weekly for performance weeks or any part thereof, payable no later than ten (10) days after the week for which the payment is due.  The amount of initial contributions to the Pension and Health Funds shall be based on the date of contract signing or date of first rehearsal, whichever is later, and shall be paid upon signing of contract or first day of rehearsal, whichever is earlier.

## X.   PER DIEM EXPENSES

Out-of-town expenses under all contracts, whenever executed, are to be paid to the Director and/or Choreographer at the rate $250 dollars per diem; except for expenses in the cities of New York, Los Angeles, Boston, San Francisco, Chicago and Washington, D.C., which shall be paid at the rate of $300.  The Producer and Director and/or Choreographer may agree alternatively to the Producer's provision of a room in a first class hotel plus $75 per day.

## XI.   DIRECTOR-CHOREOGRAPHER

A Director-Choreographer shall receive no less than the minimum combined fees and royalty percentages of a Director and Choreographer, and payments to the

Pension Fund shall be the combined payments for a Director and a Choreographer. However, there shall be single payments to the Health Fund.

## XII.   ELECTRONIC RIGHTS

(A)   When a first-class production covered by this Agreement (i.e., while the Producer controls the first-class production rights) is visually reproduced and transmitted live or on film, tape, or by any other means of remote reproduction from the stage or from a studio to viewers at home or to theatres where admission is charged, the Director and/or Choreographer shall receive an amount proportionate to that received by the author based upon the original royalties paid to the author, the Director and the Choreographer, respectively, or a sum equal to the contractual fee for directing and/or choreographing the production, whichever is greater.

The Director and/or Choreographer shall receive either:

(1)   The compensation based on the formula set forth in this Article if not engaged as the Director and/or Choreographer of the electronic reproduction; or

(2)   No less than the compensation based on the formula set forth in this Article if engaged as the Director and/or Choreographer of the electronic reproduction as the total compensation for directing and/or choreographing both the first-class production and the electronic reproduction.

(3)   Any rights beyond the visual reproduction and transmission covered in Section (A) above shall be subject to good faith negotiations between the Director and/or Choreographer and the Producer, with the understanding that the minimum payments in (A) above shall not apply.

(B)     The Director and/or Choreographer of the first-class production shall receive billing as follows:

Directed and/or choreographed for the stage by

_____.

(C)     The Producer shall provide seventy-two (72) hours notice of all electronic reproductions or transmissions to the Director and Choreographer and SDC. Notice of all recognition payments paid thereafter, if any, shall be filed with the SDC.

(D)     Unless an individual contract provides better terms, as soon as a production covered by the Agreement is reproduced electronically as defined in the Agreement in (A) above, the Director and/or Choreographer shall receive a payment equal to the contractual fee and advance, or the then current SDC minimum for director and/or choreographing the production, whichever is greater. Director and/or Choreographer shall receive no additional payments until the author receives payments in such an amount which exceeds the proportionate amount based on their respective royalties.  Thus, if on the Broadway production a director's royalty is two (2%) percent and an author's royalty is ten (10%) percent, and under the current Agreement the Director received a fee of sixty-two thousand two-hundred eighty ($62,280) dollars for directing the Broadway production, the Director would be paid another sixty-two thousand two-hundred eighty ($62,280) dollars as soon as the production was electronically reproduced and would receive no further payments until the author received three hundred eleven thousand four hundred ($311,400) dollars for the electronic reproduction. If the author received forty thousand ($40,000) dollars up front and seven thousand seven hundred fifty ($7,750) dollars every time the reproduction was presented, the Director would receive no additional payments until the reproduction was presented more than thirty-five (35) times. Under this example, on each subsequent production of the reproduction, the Director would receive one thousand five hundred fifty ($1,550) dollars.  If however, the author was paid a flat sum of three hundred eleven thousand four

hundred ($311,400) dollars up front and nothing further, the Director would receive sixty-two thousand two-hundred eighty ($62,280) dollars as soon as the production was electronically reproduced. Moreover, if the production is in the public domain, i.e., no author is receiving royalties, the Director and/or Choreographer shall receive one (1) payment equal to the contractual fee.

(E)     Unless an individual contract provides better terms, when the Director and/or Choreographer of the first-class production also directs and/or choreographs the electronic production, the minimum payment required by the Agreement for performing both functions is the payment under the formula contained in Section (A) above. Thus, using an example from above, if the same Director was engaged to direct the electronic reproduction, and if the author was paid a flat sum of three hundred eleven thousand four hundred ($311,400) dollars, the Director would receive sixty-two thousand two-hundred eighty ($62,280) dollars and would not be entitled to any additional payments under the current Agreement. Furthermore, if the DGA Agreement required a minimum fee of seventy thousand ($70,000) dollars for directing the electronic reproduction, the Director would receive a total of seventy thousand ($70,000) dollars for performing both functions (i.e., the Producer would receive an offset for the $62,280), unless the individual contract provided otherwise.

## XIII.   MEDIA AND PROMOTION

(A)     The Producer's goal in any and all promotion and publicity, including the use of captured materials, is to portray the production, including the Director, Choreographer or Director-Choreographer and all other creatives, in the most favorable light. The Producer will use captured materials, provide footage and permit its use consistent with that intent.

(B)     The Director, Choreographer and/or Director-Choreographer shall be consulted prior to the scheduling of the recording any rehearsal.

(C)    The Producer shall provide seventy-two (72) hours notice to the Director and Choreographer prior to the recording of any performance.

(D)    Except as provided in Article XII (A), captured material may only be used to generate revenue for the Producer (e.g. DVD sales, On Demand for cable or internet broadcast, licensing of B-roll or any new media usage) if there is a prior agreement in place with Director, Choreographer or Director-Choreographer.

(E)    Without limitation as to who may view captured materials, the Director, Choreographer and/or Director-Choreographer and/or their assistants may view captured materials.  Restagers working on their behalf may view captured materials, but only if the Director, Choreographer or Director-Choreographer's work has been licensed by the Producer.

(F )   The SDC and the League, as well as non-profit entities that promote the theatrical industry (e.g., ATW, TDF, NYC & Co. and similar travel and tourism bureaus), may obtain and use footage from any production (including closed productions) for purposes of promoting and branding the SDC, the League and the industry.

## XIV.  SUBSIDIARY RIGHTS

(A)    If the League grants or agrees to grant subsidiary rights to any other union during the term of the current Agreement, then the SDC shall have the right to reopen the Agreement for the sole purpose of negotiating subsidiary rights for Directors and Choreographers.

(B)    Subsidiary rights include, but are not limited to

   (1)    Stock and summer stock presentations;

   (2)    Amateur presentations;

   (3)    Musical comedy, operetta and grand opera based on a play;

   (4)    Radio;

(5)     Television;

(6)     Second-class touring rights;

(7)     Condensed and tabloid versions;

(8)     Concert tour versions;

(9)     Commercial uses;

(10)    Foreign language versions;

(11)    Original cast album of musical or straight plays;

(12)    Supper club or night club presentations;

(13)    Off-Broadway

(14)    Fair presentations and ice shows;

(15)    Motion Pictures

(16)    English speaking rights around the world:

(17)    British rights;

(18)    Foreign rights;

(19)    Any mechanical or electronic devices whether now in existence or hereafter invented and/or put in use; and

(20)    Publishing Rights.


## XV.   NO STRIKE, NO LOCKOUT

The parties agree that during the term of this Agreement, the Producers shall not lock out any Director or Choreographer and the SDC will not cause or permit any of its members to take part in any strike, work-stoppage, slowdown or concerted or organized curtailment of work (sympathetic, general or any other kind) or any other interference with the operation of the Producer's business.

## XVI.  ARBITRATION OF DISPUTES

(A)    If any dispute concerning the interpretation or application of this Agreement or any individual contract, oral or written, arises between the SDC and the Producers, or between a Director or Choreographer and a Producer, the parties agree that a prompt attempt will be made to settle the matter amicably.

(B)    If the matter is not resolved pursuant to Section (A) above, it may be submitted by either party to a Grievance Committee consisting of up to three (3) representatives of the SDC and up to three (3) representatives of the League. In rendering decisions, the SDC representatives and the League representatives shall each cast, in the aggregate, one (1) vote.  A decision of the Committee on a grievance or dispute shall be final and binding on the parties only if there are two (2) concurring votes.

(C)    If the matter is not resolved pursuant to Section (B) above, or no Grievance Committee meeting is held within thirty (30) days of a request for a meeting, either party may file a request for arbitration with any one of the following arbitrators:

Stanley Aegis        George Nicolau

Marlene Gold         Howard Edelman        Carol Wittenberg


If none of these arbitrators is available within thirty (30) days, the parties shall attempt to agree on a mutually acceptable arbitrator, however, absent such agreement, the request for arbitration may be made to the American Arbitration Association.  In the event of the death or resignation of one or more of the arbitrators, the parties shall agree upon a successor or successors within twenty (20) days. If the parties are unable to agree, said successor or successors shall be appointed by the American Arbitration Association.

(D)    The cost and expenses of the arbitration shall be shared equally by the SDC and Producer or Producers involved. The rules of procedure in such arbitration shall be the applicable rules as then currently published and in effect at the American

Arbitration Association.  All arbitration proceedings are to be conducted in the City of New York.

(E)   Where disputes are subject to arbitration under this Article, they shall be settled by arbitration in accordance with the laws of the State of New York. Arbitration shall be the sole and exclusive remedy for disputes which arise under this Agreement or under individual contracts.

(F)   No claim on behalf of a Director or Choreographer, other than a claim for breach of contract requiring a money award, or a claim relating to the interpretation or application of the terms of this Agreement, is within the jurisdiction of the arbitrator. In a dismissal case, the arbitrator's remedy is limited solely to full payment for all compensation due under the Director's or the Choreographer's contract or under this Agreement as same accrues. The arbitrator shall not have the power to require a Producer or Producers to reinstate a Director or Choreographer who he/she finds to have been discharged in breach of this Agreement or under individual contracts.  In all cases, the arbitrator shall limit himself/herself strictly to questions concerning interpretation and application of this Agreement and individual contracts, and shall in no way alter, amend, modify, add to or subtract from any provision of this Agreement or individual contracts. The arbitrator shall have the authority to award interest and expenses as he/she shall deem just and proper.

(G)   The Producers recognize that nothing in this Article shall be construed as prohibiting an individual Director or Choreographer to bargain on an individual basis with an individual Producer to secure arbitration provisions conferring jurisdiction and powers upon the arbitrator in excess of the jurisdiction and powers conferred upon the arbitrator herein.

(H)   The SDC and The League shall have the right to participate in all arbitration proceedings. A copy of the request of arbitration shall be served on the opposing parties, including the Producer, Director and/or Choreographer, SDC and League concurrently with the dispatch of the request to the arbitrator. A final and binding decision shall be issued within thirty (30) days after the hearing.

## XVII. BILLING

(A)     With respect to each company directed by the Director, he/she shall receive billing in all programs and houseboards. Such credit shall appear on a separate line in an agreed size and type and position on which no other credit shall appear.

(B)     With respect to each company choreographed by the Choreographer, he/she shall receive billing in all programs and houseboards. The Choreographer's credit shall appear on a line with no more than one other person, unless there is roll-on billing for all persons.

(C)     If a Director and/or Choreographer who has been dismissed so requests, his/her name shall be removed from all forms of billing.

(D)     The following notice, or other mutually acceptable written recognition, shall appear in all programs: "The Director and/or Choreographer is a member of the Stage Directors and Choreographers Society, a national theatrical labor union." Such notice will appear with the SDC logo, photo-ready copy to be supplied by SDC.

## XVIII. PROPERTY RIGHTS

(A)     In order to facilitate the Director's and/or Choreographer's ability to prevent the unauthorized re-creation of direction and/or choreography, the Producer and the Director and/or Choreographer agree that, as between themselves, all rights in and to the Direction and Choreography created by the Director and/or Choreographer in the course of the rendition of his/her services shall be, upon its creation, and will remain the sole and exclusive property of the Director and/or Choreographer respectively; it being understood, however, that the Producer and its licensee(s) shall have a perpetual and irrevocable license to use such direction and/or choreography in any stage production of the play for which the Director and/or Choreographer is entitled to receive a payment under

an applicable SDC minimum basic agreement. Any additional use or license of the direction and/or choreography by the Producer shall be subject to further agreement between the Producer and the Director and/or Choreographer. The foregoing is not intended to alter, diminish or affect, in any way, any of the Author's rights in the play.

(B)     The Producer shall not authorize the publication in any form of the stage directions of the Director or the choreography of the Choreographer without the Director's and/or Choreographer's written consent.  The Director and/or Choreographer reserves the right to copyright such stage direction and/or choreography.

## XIX.  ARTISTIC RIGHTS

(A)     If the Director is available, and subject to the prior approval of the author and the final approval of the Producer, the Director shall have approval, not to be unreasonably withheld or delayed, of cast, replacements, understudies, designers and designs, production stage manager, and director of other companies.

(B)     The choreography shall not be changed or altered or deleted after the New York opening without first consulting with the Choreographer.

(C)     Where necessary, the Choreographer shall have, at the sole expense of the Producer, an assistant of his/her choice during the rehearsal period during any out-of-town tryout, and during the preview period in New York City. The assistant shall not be covered by the provisions of this Agreement.  The Choreographer shall have the right to designate a captain or replacement among the dance company, who, after the show has opened in New York, shall have the authority to call the necessary rehearsals and rehearse understudies and replacements to maintain the quality of dancers' performances. The duration of the dance captain's employment and the compensation he/she shall receive shall be negotiated between the dance captain and the Producer. The

captain shall not be covered by the provisions of this Agreement. In addition, the Choreographer shall have the right to designate a replacement for the captain on the same terms and conditions as stated above, provided, however, that the Choreographer is readily available to make such designation.

(D)     The Choreographer shall select or approve a dance rehearsal pianist who will be at the Choreographer's disposal for the rehearsal, road and tour period. The duration of the rehearsal pianist's employment and the compensation he/she shall receive shall be negotiated between the pianist and the Producer. The pianist shall not be covered by the provisions of this Agreement.  The Choreographer shall have first call on the services of the pianist.  However, when not occupied with dance routines, the pianist shall be available to the rest of the company.

(E)     If the Choreographer is available, and subject to the prior approval of the author and the final approval of the Producer, the Choreographer shall have approval, not to be unreasonably withheld or delayed, of dancers, their replacements and understudies, and choreographer of other companies.


## XX.   MAINTAINING THE QUALITY OF A PRODUCTION

(A)     The Director agrees to supervise and maintain the quality of the production; and, in furtherance thereof he/she is required to see a complete performance of a production that he/she has directed at least once every eight (8) weeks, unless the Director's contractual obligations prevent him/her from doing so, in which case the Director shall see the show as soon as his/her contractual obligations permit. After seeing a complete performance of the production, the Director shall redirect it, without any additional compensation, if he/she and/or the Producer deem it necessary to do so. If the Director is required to redirect, and if at the time such redirection is desired the Director is not at the location where the Company is performing, the Producer shall pay, as set forth in his/her

contract, round-trip airfare and per diem, if necessary, for the length of the time required to redirect the production or parts thereof.

(B)     The Choreographer is required to see a complete performance of a production he/she has choreographed at least every eight (8) weeks unless the Choreographer's contractual obligations prevent him/her from doing so, in which case the Choreographer shall see the show as soon as his/her contractual obligations permit.  After seeing a complete performance of the production, the Choreographer shall rehearse it, without any additional compensation, if he/she and/or the Producer deem it necessary to do so. In the event the Choreographer is required to rehearse, and, if at the time such rehearsal is desired, the Choreographer is not at the location where the Company is performing, the Producer shall pay, as set forth in his/her contract, round-trip airfare and per diem, if necessary, for the length of the time required to rehearse the production or parts thereof.

(C)     Should the Director and/or Choreographer fail to comply with the requirements set forth in Sections (A) and/or (B) of this Article XX, the Director and/or Choreographer shall forfeit one-half (1/2) of his/her royalties until these requirements are complied with, at which time full royalty payments shall be resumed.

## XXI. PRODUCER'S REPORTING REQUIREMENTS

(A)     The Producer shall file with the SDC documentation or reports of the following information, as and when they become available, so as to permit the SDC to determine and/or verify any payment due under this Agreement:

(1)     names of all producers;

(2)     the amount of the capitalization of any tour and/or other company, and any pro forma or other projection of weekly operating expenses prepared prior to the opening of the production;

(3) weekly box office reports, signed by the Treasurer and Company Manager;

(4) weekly or cycle profit-loss statements, including itemization of operating expenses;

(5) weekly itemization of any royalty payment to a Director and/or Choreographer, including method of calculation;

(6) tour schedule(s), and any changes thereto;

(7) schedule of Producer's weekly or other guarantees for a tour and/or other company;

(8) schedule of Producer's weekly or other participation in or share of the receipts of any tour and/or other company; and

(9) such other information relevant to the determination of any payment or entitlement under this Agreement.

(B) The Producer shall notify the SDC of the following events, as and when they occur:

(1) Recoupment and 125% recoupment;

(2) License of a production or tour which will be covered under this Agreement;

(3) Commitment to establish an Other Company covered under this Agreement; and

(4) Such other events which determine or affect any payment or entitlement hereunder.

(C) The Producer shall provide the SDC no later than two (2) weeks after closing of a production notice of the closing date and an itemized summary of all monies paid under this Agreement in respect to such production.

(D) Upon reasonable notice to Producer, the SDC shall have the right to audit Producer's financial books and records once yearly at the SDC's expense.

## XXII. THE OBLIGATION OF PRODUCERS WITH SUMS OWING

(A)   If a Producer has an unsatisfied arbitration award outstanding against him/her because of the non-payment to a Director or Choreographer of contractual sums due, or because of the non-payment of pension and health sums due the SDC-League Funds, or has, in writing, admitted owing sums to a Director, Choreographer or the SDC-League Funds, and, absent a written understanding for the making of said payment between the Producer and the SDC and/or the Pension or Health Funds trustees, as the case may be, said Producer shall not be permitted to undertake a first-class production until the sums due plus interest as awarded by the arbitrator, if any, have been paid in full.

(B)   Notwithstanding the foregoing, where a Producer has failed to abide by an arbitration award requiring the payment of royalties, pension or health, or where a Producer has, in writing, admitted owing royalties, pension or health, the SDC may, at its option, require said Producer to post a bond with the SDC for said Producer's next production in the amount of contractual fees and advances for Directors and/or Choreographers. Such bonds may be used by the SDC to assure contractually required payment of any sums due a Director and/or Choreographer or due the SDC-League Funds arising from said next production.

(C)   If a Producer has failed to follow the procedures of Articles IV, IV-A, V and/or VII of this Agreement within one (1) week after written notice from the SDC, then the SDC may, at its option, require said Producer to post a bond with the SDC for said Producer's next production in the amount of contractual fees and advances for Directors and/or Choreographers. Such bonds may be used by the SDC to assure the contractually required payment of any sums due a Director and/or Choreographer or due the SDC-League Funds arising from said next production.

## XXIII.   EXISTING RELATIONS

The SDC agrees that this Agreement does not in any manner affect existing relations between Producer, Director, Choreographer and dramatist as practiced in the New York legitimate theatre in connection with the duty, authority, and control of any production.

## XXIV.   COMPLETE AGREEMENT

The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Producers and the SDC, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement, except as otherwise specifically provided.

## XXV. SEPARABILITY

It is not the intent of either party hereto to violate any laws or any ruling or regulations of any governmental authority or agency. The parties hereto agree that in the event any provisions of this Agreement are held or constituted to be void or as being in contravention of any such laws, rulings or regulations, nevertheless, the remainder of the Agreement shall remain in full force and effect unless the parts so

found to be void are not wholly separable from the remaining portions of this Agreement.

## XXVI. DURATION AND APPLICABILITY

This Agreement shall be effective as of September 1, 2008, and remain in effect until August 31, 2011.

IN WITNESS WHEREOF, the parties have set their hands and seals this day as indicated.


THE BROADWAY LEAGUE

By: _Keith Halpern_               Date: _6/8/10_

   Keith Halpern, Director of Labor Relations


STAGE DIRECTORS AND CHOREOGRAPHERS SOCIETY, INC.

By: _____               Date: _6/10/10_

   Karen Azenberg, President

## SCHEDULE A— MINIMUM FEES AND ADVANCES

I. Broadway Musicals

|                              | Director | Choreographer | Dir-Chor  |
|------------------------------|----------|---------------|-----------|
| Effective September 1, 2008  |          |               |           |
| Fee:                         | $23,830  | $19,730       | $ 43,560  |
| Advance:                     | 35,740   | 29,785        | 65,525    |
| Total:                       | $59,570  | $49,515       | $109,085  |
| Effective September 1, 2009  |          |               |           |
| Fee:                         | $24,305  | $20,125       | $ 44,430  |
| Advance:                     | 36,455   | 30,380        | 66,835    |
| Total:                       | $60,760  | $50,505       | $111,265  |
| Effective September 1, 2011  |          |               |           |
| Fee:                         | $24,915  | $20,630       | $ 45,545  |
| Advance:                     | 37,365   | 31,140        | 68,505    |
| Total:                       | $62,280  | $51,770       | $114,050  |

# SCHEDULE A—MINIMUM FEES AND ADVANCES, CONTD.

II. Broadway Dramatic Production

|  | Director |
|---|---|
| Effective September 1, 2008 | |
| Fee: | $28,795 |
| Advance: | 22,490 |
| Total: | $51,285 |
| | |
| Effective September 1, 2009 | |
| Fee: | $29,370 |
| Advance: | 22,940 |
| Total: | $52,310 |
| | |
| Effective September 1,  2010 | |
| Fee: | $30,105 |
| Advance: | 23,515 |
| Total: | $53,620 |

# SCHEDULE B:—FORM CONTRACT

**SDC**

STAGE
DIRECTORS AND
CHOREOGRAPHERS
SOCIETY

1501 Broadway, Suite 1701
New York, NY 10036-5653
TEL: 212.391.1070   FAX: 212.302.6195
www.SDCweb.org

This Agreement must be signed in quintuplicate. The Producer must file one copy with SDC prior to the first rehearsal. The Director, Choreographer, Director-Choreographer must file one copy with SDC prior to the first rehearsal. Each party retains one copy. One copy is for the agent or attorney of employee. Attach Riders to each copy as needed.

Type of Production (check one): _____ Broadway or Pre-Broadway Tour
_____ Tour  (check one)☐ Longer than 12 weeks  ☐12 weeks or Fewer
_____ Tiered Tour (check one)☐ Longer than 12 weeks  ☐ 12 weeks or Fewer
_____ SET Tour

The following constitutes our Agreement:
1. This Agreement is entered into on the _____ day of_____, 20____. Pursuant to all the terms and conditions herein set forth, _____ (Producer) agrees to engage the services of _____ _____ (Dir, Chor, D-C) and he/she agrees to accept such engagement with respect to the production of the (Dramatic Production, Musical) _____. Rehearsals are scheduled to begin on/or about _____, and the first performance is scheduled on or about _____ (in the case of a limited run the scheduled closing date is _____).

2. This Agreement is subject to and incorporates all terms and conditions of the Agreement between the Stage Directors and Choreographers Society, Inc. (SDC) and The Broadway League (League), effective September 1, 2008 (SDC-League Agreement), or its successor Agreements, and binds the undersigned to its terms for the duration of said Agreement or its successor Agreements.

3. COMPENSATION
FEE: In consideration of full and timely performance by Director, Choreographer, Director-Choreographer hereunder, Producer agrees to compensate Director, Choreographer, Director-Choreographer as follows:

FEE AND PAYMENT SCHEDULE:
Fee          $_____   Fee Schedule:   $_____ upon signing this Agreement
Advance   $_____                         $_____ on first day of rehearsal
Total        $_____                         $_____ on first day of second week of rehearsal
                                                                $_____ on first day of third week of
                                                                                   rehearsal, but not later than 1 week before 1st performance

ROYALTY: Producer agrees to pay Director, Choreographer, Director-Choreographer weekly a sum equal to _____ _____

The Producer is authorized to send compensation to: _____

4. The undersigned authorizes the Producer to deduct two and one-half percent (2 1/2%) of all compensation due under this Agreement, with a maximum assessment on royalties of $10,000 for Director, $7,500 for Choreographer or $17,500 for Director-Choreographer from each company of the Dramatic Production/Musical per calendar year, or such other dues or assessments as the SDC shall lawfully establish, and to remit all such deductions to the SDC no later than seven days after such deduction is made.  This authorization shall be irrevocable for a period of one year or until the termination date of the SDC-League Agreement, whichever is sooner, and shall renew itself from year to year unless the undersigned gives written notice addressed to the SDC, 1501 Broadway, New York, New York  10036, at least fifteen (15) days prior to the termination date of the revocation of this authorization.

5. PENSION AND HEALTH:  The Producer shall make pension and health contributions to the SDC-League Pension Fund and the SDC-League Health Fund as specified in the SDC-League Agreement.

6. GRIEVANCE OR DISPUTE:  Any dispute arising out of this Agreement shall be settled pursuant to the procedures contained in Article XV of the SDC-League Agreement.

7. RIDERS:  Any Riders must be attached to each copy of this Agreement.

| Accepted: | Producer _must_ sign contract first. |
|---|---|
| DIRECTOR, CHOREOGRAPHER, DIRECTOR-CHOREOGRAPHER | PRODUCER |
| (Signature) _____ | (Signature) _____ |
| (Please print name) _____ | (Please print name) _____ |
| Date_____ | Date_____ |
| Address _____ | Address _____ |
| _____ Zip _____ | _____ Zip _____ |
| Phone _____ | Phone _____ |
| Social Security No. _____ | Employer Federal ID No. _____ |
| Email address _____ | Email address_____ |
| Member of SDC: yes _____   no_____ | Member of the League: yes _____   no_____ |
| Revised 3/8/10 | |

----identify copy----

**BROADWAY/TOUR**

# SCHEDULE C:— TOUR/OTHER COMPANY NOTIFICATION FORM



STAGE
DIRECTORS AND
CHOREOGRAPHERS
SOCIETY

1501 Broadway, Suite 1701
New York, NY 10036-5653
TEL: 212.391.1070   FAX: 212.302.6195
www.SDCweb.org

## Tours and Other Companies

This form is to be used for all First Class activity under ARTICLE V (Tours and Other Companies).  Please complete this form and return to SDC via e-mail (MMelleno@SDCWeb.org) or (BWolkoff@SDCWeb.org) or fax (212) 302-6195.

**ARTICLE V (Tours and Other Companies)**

Production:_____

Name of Producing Entity (If different from original entity):
_____

General
Manager:_____

Company
Manager:_____

Company Manager email address/cell phone:
_____

Director:_____

Choreographer:_____

Date of 1st rehearsal:_____

Date of 1st performance:_____

Date of final performance (if known):_____

*Please forward (via e-mail or fax) a playing schedule/touring itinerary when it becomes available.*

**Director's Terms:**

_____ Per the original contract rider for Additional Companies.

_____ Modified from the original contract rider for Additional Companies.

If the latter, please identify the terms that differ from the original rider (fee, royalty, etc.) and the details of the new terms.

**Choreographer's Terms:**

_____ Per the original contract rider for Additional Companies.

_____ Modified from the original contract rider for Additional Companies.

If the latter, please identify the terms that differ from the original rider (fee, royalty, etc.) and the details of the new terms.

This form completed by:_____
Date:_____

Revised 4/12/10

# BROADWAY/TOUR

# Exhibit 4



## ssdc

APR 7 1999

USDOL
OLMS

061-385

*Society of Stage Directors and Choreographers*
*an independent national labor union*
Revised 6/12/98

## BYLAWS

### ARTICLE I  NAME AND SEAL

**(A)**   The name of this union shall be the Society of Stage Directors and Choreographers.

**(B)**   The seal of the Society shall bear the name of the organization and year it was originated.

### ARTICLE II  OBJECTIVES

**Credo:**  It is the broad purpose of this Society to elevate the standards of the art of stage direction and choreography; to develop communication among the director and choreographer craftspersons; to establish means for the dissemination and exchange of ideas of directorial and choreographic interest to the profession; to aid in the development and training of directors and choreographers; to increase in the professional and public esteem these arts and to develop all conditions that will encourage them, and to further, very specifically, the following objectives:

**(A)**   The Society may serve and have jurisdiction over all stage directors and choreographers who are associated with the theatrical stage in all of its various divisions.  The Society may serve and have jurisdiction over all media choreographers. Reference to "media" in these Bylaws shall refer to film, television, music video, or other technology capable of reproducing visual images, existing or not yet invented.

**(B)**   The Society shall function as a clearing house for the dissemination and advancement of new ideas and developments in the craft and will cooperate and encourage other crafts and unions within our industry to do the same in order to best serve the craft and profession of our Membership.

**(C)**   The Society shall carry into effect such policies as shall secure the united action of all its Members for their common good.

**(D)**   The Society shall assist its Members in securing just and equitable contracts, agreements, working conditions, and minimum compensation in their dealings with

1

 

producers and managers of theatrical productions, and shall take action to abolish any unfair dealings, abuses, and other conditions which are detrimental to its Members.

(E)     The Society shall engage in and/or negotiate and consummate contractual relations with:

(1)  producers and managers of theatrical productions, individually or collectively, and other persons, and will regulate all arrangements that relate to conditions benefiting its Membership.

(2)  producers and managers of media productions, individually or collectively, and other persons, and will regulate all arrangements that relate to conditions benefiting its choreographer Membership.

(F)     The Society shall foster and authorize the organization and admission of locals and/or branches in such areas and territories it deems fit and proper.

(G)     The Society shall encourage, advance, and secure proper legislation and other governmental action in the interest of the profession in which its Members are engaged.

(H)     The Society shall combine and coordinate its activities with the activities of other organizations for the common good, when such combination or coordination shall be to the best interest of the Members of the Society and, when deemed advisable, shall affiliate, merge, or associate with any other organization for mutual benefit.

## ARTICLE III  MEMBERSHIP

(A)     Qualifications

(1) Any stage director or stage/media choreographer who at the time of his or her application for Membership shall present evidence of his or her paid prior engagement as a stage director or stage/media choreographer for any theatrical production or companies organized under Equity, AGVA, AGMA, SAG or AFTRA, and who is willing to obligate himself or herself to support in good faith the objectives and requirements of Membership, shall be accepted as a Member of this Society.

(2) In the case of any applicant for Membership after September 1, 1998 who is not a citizen of the United States of America or a permanent resident alien, the rights and privileges of Membership for such applicant shall be limited to the period during which he or she is employed pursuant to a Society employment agreement and/or receiving compensation under any such agreement. After such period, such Member shall be deemed to have honorably withdrawn from Membership in the Society.

(B)     Honorary Life Membership

The Society through its Executive Board shall have the power to confer honorary life Memberships in recognition of outstanding creative achievement or contribution. The individual

2



so selected need not be active as a stage director or stage/media choreographer at the time of such award, but if he or she is, or has been, or becomes an active Member of the group, he or she may enjoy all the privileges of Membership, including the right to vote and the right to hold office in accordance with the provisions of the Bylaws.

(C)     Application

(1) No person shall become a Member unless and until he or she shall sign an application on a form provided by the Executive Board and be voted into Membership by the Executive Board. The application form shall provide that he or she agrees to be bound by the Bylaws of the Society and by such amendments thereto as may be thereafter locally made and by any bylaws, rules, regulations, or orders existing or thereafter lawfully enacted pursuant to such bylaws and any amendments thereto.

(2) Such applicant's form may contain further terms and provisions and such further information reasonably pertinent as the Executive Board may from time to time prescribe.

(3) All applications for Membership must be filed through the Executive Director and must be accompanied by full initiation fees plus current dues. In specific instances where such payment may work undue hardship on an applicant, the Executive Board may alter this provision.

(4) Each applicant shall receive a copy of these Bylaws.

(D)     Conditions of Membership

Members shall be obligated pursuant to these Bylaws, as a contractual condition of Membership, to comply with these Bylaws and such Work Rules as may be established by the Executive Board, including, without limitation, the timely payment of all dues, assessments and fines.

## ARTICLE IV GOVERNMENT

(A)     The governing body of the Society shall be known as the Executive Board and shall consist of a President, Executive Vice President, Vice President, Secretary, and Treasurer, and in addition thereto twenty-five (25) Members, all of whom shall hold the title Members of the Executive Board, consisting of a total of thirty (30) persons.  The Membership of the Executive Board will include no less than one regional representative from each of five (5) geographic areas: Northeast, Southeast, Mid-West, Southwest and Northwest.  The specific states in each region will be established by the Board by a two-thirds majority vote at a regular meeting of the Board prior to the nomination of any candidates.
All elections shall require that the number of directors and choreographers nominated be based on the respective Membership of each in the Society according to the books of the Society as of the preceding annual meeting; however, at least five (5) director Members and five (5) choreographer Members shall be nominated.

3

(B)     The term of office of all Executive Board Members, including officers, shall be three (3) years. The terms shall be overlapping, with the first group comprised of the President and nine (9) Board Members, of which one (1) will be from the Southeast region, one (1) will be from the Mid-west region and seven (7) will be at-large; the second group, comprised of the Vice President, Secretary, and eight (8) Board Members, of which one (1) will be from the Southwest region, one (1) will be from the Northeast region and six (6) will be at-large; and the third group, comprised of the Executive Vice President, Treasurer, and eight (8) Board Members, of which one (1) will be from the Northwest region and seven (7) will be at-large.  Officers shall be limited to two (2) consecutive full terms for each office. No Member shall serve on the Executive Board or as an officer for more than twelve (12) consecutive years, except that any Member elected whose term exceeds the twelfth year may complete that term of office.

(C)     No Member shall be eligible for Membership on the Executive Board unless he or she has been a Member-in-good-standing for at least two (2) years prior to the date of his or her nomination.   No Member shall be eligible for election as an officer unless he or she has been a Member-in-good-standing for at least five (5) years prior to the date of nomination and has previously been elected a Member of the board.

(D)     The Executive Board shall appoint an Executive Director, Counsel, and such other persons required to assist the Executive Board in the management of the affairs of the Society on such terms and conditions as it may deem proper subject to the ratification of the general Membership.
        The Executive Director shall be the Society's chief administrator, responsible for the management of the staff and operation of the Society.  He or she shall receive all authority for his or her activities from the direction and policies of the Executive Board. The Executive Director shall not have the authority to enter into or terminate contracts, alter or amend the Bylaws, or borrow or lend money for or on behalf of the Society without express authorization from the Executive Board.

(E)     The Executive Board shall be responsible for all disbursements, and no disbursements shall be made without the authorization of the Executive Board. All disbursements shall be made by checks drawn upon the general fund, and shall be signed by two (2) officers, one (1) of whom must be the Treasurer or the Executive Vice President, or by one (1) officer and the Executive Director.   Notwithstanding the foregoing, the Executive Board may authorize the Executive Director to sign alone disbursement checks in such amounts as the board deems appropriate.

(F)     The Executive Board shall examine and act promptly upon any request made in person or in writing to the Secretary of the organization by any Member, looking to the protection of the rights of such Member within the jurisdiction of this Society.

(G)     The Executive Board, on its own initiative, shall have the power to take any necessary action and render any necessary decisions to carry out fully and adequately all provisions contained in the Bylaws and agreements entered into by the Society, and, in order to effect such action, the Executive Board shall have the right to represent and act for any of the Members and/or appoint representatives to act for any Member or Members on its behalf and take such further action as it may deem necessary.

4

 

**(H)**      The Executive Board shall have the power to hear in the first instance any complaint relevant to the purposes of the Society filed against any of its Members by another Member or by any person, firm, or corporation, or against any person, firm, or corporation. In the case of a complaint of one Member against another, an effort at conciliation should be made by an appropriate officer of the Society designated by the President or the Executive Vice President. If the attempt at conciliation should fail, both Members shall be directed to appear before the Executive Board to present their case, and the Executive Board shall thereafter take such action as it deems fit and necessary. Any Member shall have the absolute right to appear at an Executive Board meeting to seek aid or redress in connection with any matter within the jurisdiction of the Society, provided notice of his or her intention to attend such Executive Board meeting is given to the Executive Director prior to such meeting.

**(I)**      A quorum of the Executive Board shall consist of ten (10) Members, of whom at least one (1) shall be an officer. A majority vote of Executive Board Members present at any meeting shall determine any questions before the Board, except for the approval of Minimum Basic Agreements, changes in the Bylaws, or affiliation with any other organization. These questions must be determined by a majority vote of the entire Board.

**(J)**      All actions taken by the Executive Board shall be in writing and a permanent record kept thereof. Every Member of the Executive Board shall receive a summary of the minutes of every meeting of the Executive Board.

**(K)**      The Executive Board shall approve the following standing committees, and others as needed.  The President shall appoint the chairperson(s) of such committees.

>     (i)      Executive
>     (ii)     Finance
>     (iii)    Fines and Penalties
>     (iv)     Personnel

Only the President and/or Executive Board shall have authority to establish committees on behalf of the Society.

At least one (1) Member of the Executive Board shall be a Member of each committee, with the other Members of the committees to be chosen from the general Membership.  The duties and responsibilities of these committees shall be both administrative and advisory as the Executive Board shall determine in each instance. All actions of such committees shall be subject to the approval of the Executive Board. The Executive Board shall have the power to appoint and dismiss committees in order to carry on the work of the Society as it may deem proper. It shall determine the extent of the power, the duties, and compensation of said persons and bodies.

**(L)**      The Executive Board shall endeavor to meet at least once in each of ten (10) months each year at such place and time as the Executive Board may designate.

5

 

(M)   Special meetings of the Executive Board shall be held at the call of the President or Executive Vice President or upon the written call of three (3) Members of the Executive Board filed with the Executive Director, which call shall state the reason for the special meeting. Not less than 48 hours prior notice shall be given for special meetings except in cases of emergency.

(N)   Any Member of the Executive Board who misses six (6) consecutive meetings may be replaced. The Executive Board may remove such Member by a vote of two-thirds (2/3) of the Board Members in attendance at a meeting, provided that the Executive Board has given such Board Member at least thirty (30) days written notice of the Board meeting at which the Member's removal will be considered and the right to appear before the Board at the meeting to explain such absences.

(O)   If a vacancy occurs in an at-large position of the Board, the position shall be filled by the at-large candidate who received the next-highest number of votes in the most recent general election. If a vacancy occurs in the position of a regional representative, such position shall be filled by the candidate from that region who received the next highest number of votes in the most recent general election; in the event that no such candidate is available, the Board shall appoint such replacement. If a vacancy occurs in any office of the Board, the Board shall elect a successor, and all Board Members shall be polled in such elections. Any replacement shall serve the remainder of the term of the position which he or she assumes.

(P)   Notwithstanding any statements in the above provisions, it is the essence of these Bylaws that all powers of this organization reside in the Membership as a body, and that the powers of the Executive Board and its officers derive from the Membership.

(Q)   The Executive Board may, at any time, by its own action submit any proposal to the Membership for referendum vote, if it should so desire.

In all cases, the outcome of a referendum vote shall take precedence over all other determinations on a particular matter, whether such determinations are made by the Executive Board, its officers, its employees, or by a Membership meeting.

## ARTICLE V  DUTIES OF OFFICERS

(A)   The officers of the Executive Board are President, Executive Vice President, Vice President, Secretary and Treasurer. The Executive Board may, from time to time, designate additional duties and authority to officers and committees, but not in conflict with any of the terms herein. The duties and replacement powers in regard to absence of officers shall obtain in the following order of succession: President, Executive Vice President, Vice President, Secretary, Treasurer. In the absence of any officers, the Executive Board may, from among themselves, at any regular or called meeting, elect officers pro tem. Meetings shall be conducted in the spirit of Robert's Rules of Order (that is, in a manner conducive to democratic discussion of all matters on the agenda, and in a manner that permits decisions to be made according to the majority rule, both at the Executive Board and at Membership meetings).

(B)   The President shall provide the overall leadership of the Society. He or she shall preside at all meetings of the Executive Board and of the Membership. He or she shall have the authority



to sign and execute, in the name of the Society, all authorized agreements or other instruments, and he or she shall have such other powers and duties as are provided for in these Bylaws.

**(C)** The Executive Vice President shall, in the absence of the President, perform the duties and exercise the powers of the President. Between Executive Board meetings, the Executive Vice President shall remain in contact with the Executive Director to monitor the execution of decisions made by the Board.

**(D)** The Vice President shall act as the Executive Board's liaison to chairpersons of every committee. His or her responsibility shall be to monitor and/or advise these chairpersons in the preparation and execution of their committee work.

**(E)** The Secretary shall be expected to review, together with the Executive Director, the minutes from every Executive Board meeting before the final copy is mailed. The Secretary shall further be expected to oversee the maintenance of a complete record of the entire Membership and shall report quarterly to the Executive Board regarding the announcement of new Members, the status of withdrawals and suspensions, and all other pertinent information of the entire Membership.

**(F)** The Treasurer shall keep full and accurate accounts of the funds of the Society, shall submit an annual budget for approval by the Executive Board and shall, with the Executive Director, monitor the execution of that budget throughout the fiscal year. He or she shall further submit to the Executive Board a monthly itemized account of all monies expended by the Society and shall prepare a yearly statement, audited by an outside CPA, which shall be communicated to the Membership at the semi-annual meeting.

**(G)** The officers are Members ex-officio of all committees. The Executive Board may, from time to time, designate additional duties and authority to officers and committees, but not in conflict with any of the terms hereof.

## ARTICLE VI  MEMBERSHIP MEETINGS

**(A)** All Members-in-good-standing shall be entitled to attend and to speak at all meetings of the Society.

**(B)** The annual meeting of the Society shall be held in November of each year at such time and place as the Executive Board may designate, for the purpose of hearing reports on the affairs of the Society, installing newly elected officers and Executive Board Members, and transacting such other business as may properly be brought before the meeting. The semi-annual meeting will be held in May for the purpose of presenting the annual report of the Society, electing five (5) Members of the Nominating Committee and two (2) alternates from the Membership, reporting on the affairs of the Society, and for such other business as the Board and Membership shall determine.

**(C)** At the request in writing of at least ten (10) Members-in-good-standing, the President or

 

Executive Vice President shall call a special meeting of the Society; notice of such meeting shall contain the reason for it as stated in the original request; action taken at such meeting shall be limited to the specific issue. Any resolution passed at such meeting shall be of an advisory nature and not binding upon the general Membership or the Executive Board. However, the Executive Board shall have the right to submit such resolution to a referendum of the Members of the Society by mailed ballot.

      The result of the referendum will prevail only in the event that it is carried by a two-thirds (2/3) majority of all votes received from such referendum, provided that such response represents at least twenty percent (20%) of the active Membership.

(D)    Any Member entitled to vote at any meeting may do so in person except as otherwise provided for in these Bylaws. The Executive Board may, at any time, solicit by mail the opinion of the Membership on any question, it being understood that the response shall be only a guide to the Executive Board and shall not be binding on any action considered by the Executive Board.

(E)    Twenty (20) Members-in-good-standing present and entitled to vote shall constitute a quorum for any Membership meeting.

(F)    Action at Membership meetings shall be by majority vote, except as otherwise provided in the Bylaws.

(G)    The Executive Director shall cause written notices of each annual, regular, or special meeting to be sent to each of the Members at the address last registered by said Member not less than ten (10) days before such meeting.

## ARTICLE VII   NOMINATIONS AND ELECTIONS

Voting for Members of the Executive Board of the Society shall be as follows:

(A)    (1) The Nominating Committee will consist of ten (10) Members and four (4) alternates: five (5) Members and two (2) alternates shall be members of the Executive Board, and five (5) Members and two (2) alternates shall be Members who are not on the Executive Board. The Nominating Committee's composition shall maintain a ratio of directors and choreographers that reflects the ratio of directors and choreographers in the Society at the time of the previous Membership meeting. The five (5) Members and two (2) alternates from the Membership-at-large shall be elected at the semi-annual meeting in May.

      No Member of any Nominating Committee may be a candidate that same year.

    (2)    The selection of five (5) Members and two (2) alternates by the Executive Board to the Nominating Committee shall take place no later than May 31.

    (3)    The chairperson of the Nominating Committee shall be an Executive Board Member appointed by the President. Nominating Committee alternates shall be required to attend all meetings and will be activated to vote as required to fill absences of their respective categories.

8

(4)      Six (6) affirmative votes shall be necessary to decide all nominations. A quorum of six (6) must be present to conduct the business of the Nominating Committee.

(5)      At least thirty (30) days prior to the first meeting of the Nominating Committee, an inquiry will be made of all Members as to their interest in serving on the Executive Board.

(6)      The Nominating Committee shall select a slate of at least sixteen (16) candidates for the Executive Board to be listed in alphabetical order for submission to the Membership, including at least two (2) for each regional representative position up for election. The Nominating Committee shall notify all potential nominees of the responsibilities of the position and ascertain their willingness to serve if elected, and then present the slate of candidates to the Board at the June Board meeting.

(7)      The complete slate of nominees shall be circulated to the entire Membership no less than sixty (60) days before the annual Membership meeting in November indicating the at-large and regional representative candidates.

(8)      The sequential expiration and election of Officer and Board Member terms provided in Article IV(B) will commence with the 1999 elections and will continue, once established, for every election thereafter.

(B)      Any Member-in-good-standing has the right to be a candidate for a position on the Executive Board by submitting a written petition containing the signatures of ten (10) Members-in-good-standing to the Executive Director, which must be received forty (40) days prior to the annual meeting in November.

(C)      A copy of the above Bylaw, Article VII, Paragraph B, shall accompany the original circulation of the Executive Board's slate of nominees.

(D)      Ballots shall be mailed to the entire Membership no later than thirty (30) days before the annual meeting in November.  The ballot will direct the Members to vote for an exact number of candidates equal to the number of open positions.

(E)      The regional representative candidate receiving the highest number of votes in each region will be elected to the board followed by the remainder of the candidates with the highest number of votes, without regard to region.

(F)      All ballot forms must be received in the offices of the Society no later than 3:00 p.m. on the day of the annual meeting in November.  The Board will appoint a Tellers Committee consisting of one (1) Board Member, one (1) Member of the Nominating Committee, and one (1) Member-at-large to count the votes on the day of the November Board meeting and to decide any questions that arise.

(G)      The results of the election will be announced at the annual meeting in November and the new officers and Executive Board Members will assume office at that time.

 

(H)    In order to take advantage of their experience, all past Presidents of the Society shall become Members of an Honorary Advisory Committee. The Board, at its discretion, may name as additional Members to this committee persons who have made distinguished contributions to the Society. Members of the Honorary Advisory Committee have the right to attend all Board meetings but shall have no right to vote.

(I) Voting for Officers of the Executive Board of the Society shall be as follows:

(1) Candidates for positions as Officers of the Society shall be nominated at the regular September meeting of the Board.  In addition, any Member of the Society may submit for the Board's consideration at the September meeting a petition, with ten (10) supporting Member signatures, nominating a qualified candidate for an office up for election in that year.

(2) Discussion of Officer nominations will be on the agenda at the October Board meeting.  All nominees may present their credentials and positions at this meeting, either in person or in writing.  Secret ballots for officer elections will be distributed to all Board Members who are present at the October meeting and to all other Board Members by express mail immediately following the meeting.  Board Members must return their votes no later than fifteen (15) days after the October meeting.  The votes will be tallied by a Tellers Committee composed of one (1) staff member, one (1) Board Member and one (1) Member-at-large.

(3) If no officer candidate receives a majority vote of the Board, a run-off election between the two (2) candidates receiving the highest number of votes will be held before the November meeting, with secret ballots sent by express mail to all Board Members.  All election results will be announced at the November Membership meeting, and the Executive Board officers will assume office at that time.

## ARTICLE VIII NEGOTIATIONS

(A)    The bargaining representatives shall be designated by the Executive Board.

(B)    The Society, through its Executive Board, will:

(1) establish basic agreements with producers and managers of theatrical productions in all branches of the industry to govern rates of compensation and working conditions of its Members. These shall be established through individual and/or collective agreements, negotiated and/or promulgated by the Society.

(2) establish basic agreements with producers and managers of media productions in all branches of the industry to govern rates of compensation and working conditions of its choreographer Members.  These shall be established through individual and/or collective agreements, negotiated and/or promulgated by the Society.

(C)    In addition to all other responsibilities, it shall be the duty of the Executive Board to carry into effect and administer the terms of any basic agreements and general working conditions.

10

**(D)**     It shall be the duty and responsibility of all Members to cooperate with and assist the Executive Board in promptly carrying out all obligations under such agreements and to comply with all rules, regulations, and decisions of the Executive Board. Any Member committing a breach of these provisions shall be subject to a fine and other disciplinary action, as provided.

**(E)**     When basic working conditions have been determined, no Member shall accept employment or continue employment from a producer or manager of theatrical productions who is not a signatory to an agreement containing the basic provisions covering compensation and working conditions established, or to be established, for that division of the industry.

**(F)**     All basic agreements, amendments, or modifications thereof shall be ratified by the Executive Board and then submitted to the Members for ratification at a Membership meeting or meetings in one or more cities or by mail ballot, as determined by the Executive Board. A majority of the Members attending a meeting or meetings duly called or a majority of mail ballots returned, shall be sufficient for ratification. In the event that the Executive Board shall fail or refuse to recommend ratification or modification of any agreement, a special meeting or meetings may be called, as provided in Article VI, Section C, of these Bylaws.  A two-thirds (2/3) vote of the Members attending will constitute ratification of such agreement.

**(G)**     There shall never be established any maximum rates of compensation, and this clause may not be amended.

**(H)**     It shall be the duty of every Member to report immediately to the Society any directorial/choreographic assignment he or she has secured, and to provide the Society with a copy of the terms of his or her engagement, where such engagement is covered by an existing, collective agreement or Work Rule. Such notifications shall be subject to and in accordance with the rules and regulations of the Executive Board. All such written contracts shall be absolutely confidential, subject to perusal only by the Executive Director, appropriate staff, and/or Counsel for purposes of enforcing or otherwise protecting the terms of any agreement.

## ARTICLE IX  TRIALS AND HEARINGS

**(A)**     Any Member or Members who shall be guilty of an act, omission, or conduct that is prejudicial to the welfare of the Society, or who shall fail to observe any of the requirements of the Bylaws or any lawful rule or order of the Executive Board, or fail to abide by any basic agreement or agreements entered into by the Society, may, at the discretion of the Executive Board, be censured, suspended, or expelled from Membership, or be subject to fine or otherwise punished or disciplined by the Executive Board.
        Decisions of a disciplinary nature shall be made at a meeting of the Executive Board called for that purpose, at which a quorum shall be present, and such decision shall be adopted by a two-thirds (2/3) vote of those present at the meeting.

**(B)**     The Executive Board shall give to each accused at least ten (10) days written notice of the hearings and shall include in such notice a written copy of all charges. The accused shall be entitled to be present and heard by the Executive Board and may be represented by counsel. In all cases, the person accused shall be furnished information concerning the source of all charges.

11

 

The Executive Board shall allot for each trial such time as it deems proper and necessary in the circumstances. All decisions of the Executive Board shall be in writing and filed with the Secretary, who shall, within fourteen (14) days of such filing, remit a copy thereof to the accused. Decisions of the Executive Board shall be filed with the Secretary no later than thirty (30) days from the close of trial.

(C)     Pending determination of an appeal to the annual meeting, the Member shall have none of the privileges of Membership of which he or she may have been deprived by order of the Executive Board.

(D)     Any Member against whom a fine has been levied by way of disciplinary action and who fails to comply within thirty (30) days with the order of the Executive Board, duly entered against him or her, shall be subject to suspension from Membership and civil action for the recovery of such fines.

(E)     The Executive Board shall have power by a two-thirds (2/3) vote of those present at a meeting duly called for that purpose to reinstate any Member who has been expelled or suspended for reasons other than nonpayment of dues or by the same vote to relieve any Member of any discipline imposed.

## ARTICLE X  NOTICES

All notices required to be sent to any Members shall be sent by telegram, mail, electronic mail or facsimile to such Member's address as it appears on the books of the Society, and such correspondence shall be conclusive evidence of the service thereof, and such notice shall be effective as of the date of the mailing or sending, as the case may be, and all periods of time shall run from the date of such mailing or sending.  In case of any electronic-mail or facsimile correspondence, a copy shall also be mailed.

## ARTICLE XI  INITIATION FEES, DUES, AND ASSESSMENTS

Initiation fees, dues and assessments shall be established by the Executive Board and ratified by the Membership and may be changed only by resolution of the Executive Board and ratified by the Membership.

(A)     (1) All dues for the coming calendar year are due and payable January 1. Dues not received by April 1 will be subject to a penalty fine, determined by the Executive Board, for each quarter during which they have not been paid.

(2) All assessments on any income earned within a quarter are due and payable at the end of the following quarter. Assessments not paid on time are subject to a penalty fine determined by the Executive Board, for each quarter during which they have not been paid.

(B) Assessments on earnings from continuing productions, property rights obligations, subsidiary participation or other compensation resulting from SSDC contracted employment, shall be due and payable by the successors, assigns or estate of a Member.

12



## ARTICLE XII SUSPENSIONS

**(A)**     Members may be suspended. Any Member who is delinquent one (1) quarter (i.e. ninety (90) days) in dues and/or assessments, and thirty (30) days in fines, shall be deemed not in good standing and will be suspended from Membership. Cases involving extraordinary circumstances may be appealed to the Executive Board for review.

**(B)**     Members suspended for nonpayment of dues and/or assessments shall not be entitled to accept an assignment as a stage director and/or stage/media choreographer in any theatre or venue under contract with the Society.  Suspended Members are obligated to comply with the Bylaws and Agreements of the Society during the period of their suspension. They shall forfeit all rights of Membership for the duration of the suspension.

**(C)**     The Membership of any Member who has been on suspension for three (3) years or more shall be automatically terminated. Should such Member desire to return to active Membership in the Society at any future time, he or she shall be required to submit an application as a new Member accompanied by the initiation fee and current dues, as well as past arrears. Cases involving extraordinary circumstances may be appealed to the Executive Board for review.

**(D)**     No Member suspended in accordance with the foregoing shall be entitled to accept an assignment as a stage director or stage/media choreographer unless specifically authorized to do so by the Executive Board, and subject to such terms and conditions with respect to the payment of his or her arrears as may be determined in his or her individual case.

## ARTICLE XIII  TRANSFER, FORFEITURE, AND TERMINATION OF MEMBERSHIP

**(A)**     Membership in the Society is nontransferable, and is lost and terminated on expulsion or resignation from the Society, and is suspended on suspension from the Society.

**(B)**     (1) Honorable withdrawal may be granted to any Member who has been a Member-in-good-standing for a period of at least one (1) year. The Member must make written application and state his or her reason for requesting inactive status.

        (2) Honorable withdrawal is valid only if a Member does not direct and/or choreograph for at least one (1) year from the date the request for honorable withdrawal is granted. If the Member returns to active Membership within a year or less, then dues are payable as though no honorable withdrawal had taken place.

        (3) Upon the Member's return to active Membership (within a period of from one (1) to three (3) years), he or she will pay a reinstatement fee of fifty dollars ($50.00) plus the then current dues. If his or her honorable withdrawal exceeds three (3) years, his or her assessments shall be at the discretion of the Executive Board. While on withdrawal, all services usually extended to active Members will be withheld. Members-in-good-standing who wish to remain on

13

 

the Society's mailing list may continue to receive all newsletters and bulletins, provided they pay such subscription costs as may be determined by the Executive Board.

## ARTICLE XIV  AMENDMENTS

The Executive Board, or any ten (10) Members-in-good-standing, by petition in writing addressed to the Executive Board, may propose amendment or repeal of the existing Bylaws or adoption of new Bylaws. And such proposals shall be submitted to the Membership in writing at least six (6) weeks prior to the annual or semi-annual meeting, whichever the case may be. Such proposals shall be on the agenda for discussion at the annual or semi-annual meeting. Within two (2) weeks thereafter, any such proposals shall be submitted to the Membership for referendum vote and shall become effective if approved by at least two-thirds (2/3) of the Membership responding, provided that such response represents at least twenty percent (20%) of the active Membership.

## ARTICLE XV GENERAL CLAUSES

(A)    Parliamentary matters controlled by Executive Board. Parliamentary matters, rules, and regulations governing Members' meetings shall be under the control of the Executive Board. Robert's Rules of Order shall be the official rule book for the conduct of all meetings.

(B)    Reference to the "Society." In these Bylaws, the Society of Stage Directors and Choreographers is sometimes referred to as the "Society." It shall be sufficient in any future rule, order, or notice to so refer to the organization.

(C)    Reference to the "Executive Board." Whenever the term "Executive Board" appears in these Bylaws, it is understood that it refers to the Executive Board of the Society of Stage Directors and Choreographers.

(D)    Executive Board to set order of business at annual and Membership meetings. The order of business at the annual meeting and at the Membership meetings of the Society shall be prescribed by the Executive Board, but shall include reports of committees and general business, and ratification of any Bylaws or amendments to the Bylaws requiring action.

(E)    If any portion of these Bylaws shall be held to be illegal, such portion shall be deemed to be separable from the other portion of the Bylaws and shall not affect the legality of the other.

(F)    Whenever the word Bylaws appears in the present document, it is understood that it refers to the Constitution and Bylaws of the Society of Stage Directors and Choreographers.

14



**Society of Stage Directors and Choreographers**
**Work Rules and Guidelines**
**(Effective April 21, 1997)**

## I  CONTRACT FILING

### A.  Late Contracts

1.  Society Members must file contracts to direct or choreograph a production with the SSDC office prior to the commencement of rehearsals. Under no circumstances may a Member go into rehearsal without a properly signed and filed SSDC contract.

2.  The fine for a Member's failure to file a contract prior to the first day of shall be up to $500 for First-Class Broadway, National and Bus & Truck productions, and up to $200 for all other productions. Thereafter, for each additional week the contract is not properly signed and filed, the fine will increase by up to $250 per week for First-Class Broadway, National and Bus & Truck productions, and by up to $100 per week for all other productions, accruing until the first public performance.

3.  Contracts not filed by the first public performance shall be treated as "Unfiled Contracts."

### B.  Unfiled Contracts

1.  Society Members must file SSDC-approved form contracts for all employment to direct and/or choreograph for the stage. For employment outside of an established Minimum Basic Agreement arena, the Special form contract shall apply.

2.  Failure of a Member to follow this requirement may result in a penalty equal to twelve and one-half (12 1/2%) percent (10% penalty, 2 1/2% assessment) of potential minimum earnings under the SSDC contract deemed applicable by the Society, or of actual earnings if greater than such minimum. In no case shall this fine be less than $250.

## II  STRIKE LIST

A.  No Society Member may work for a producer or theatre posted on the Society's Strike List. It shall be the Member's responsibility to ascertain from the Society a producer's or theatre's current status.

B.  The fine for directing or choreographing a stage production for a producer or theatre on the Society's Strike List shall be an amount equal to twenty-five (25%) percent of potential minimum earnings under the SSDC contract deemed applicable by the Society, or of actual earnings if greater than such minimum. In no case shall this fine be less than $500.

 

## III. SUBSTANDARD CONTRACT TERMS

The Bylaws of the Society, as well as these Work Rules and Guidelines, provide for disciplinary action against any Member who signs a contract agreeing to fees, royalties or other terms and conditions less than those stipulated in the applicable SSDC Minimum Basic Agreement, as determined by the Society.

## IV. ROYALTY REDUCTIONS

A. Royalty pools, deferrals and/or reductions must have the prior approval of the Society, except for deferrals and/or reductions of up to four weeks on First-Class productions and up to six weeks Off-Broadway.

B. A Member's failure to obtain necessary approval from the Society for a continuation of royalty deferrals and/or reductions shall result in a fine of up to $2,500 at the discretion of the Executive Board.

## V. GRIEVANCE AND ARBITRATIONS

A. Whenever a contractual dispute arises between an employer and a Member of the Society, the Member shall contact the Society immediately and inform the Executive Director of the circumstances of the dispute.

B. With advice of Counsel, the Society shall promptly evaluate the dispute and recommend proper legal action.

C. If a decision is made to proceed with grievance or arbitration of a claim, legal counsel and representation will be provided by the Society.

D. When these Work Rules and Guidelines have been strictly observed by a Member of the Society, the only deduction the Society shall make from an award or settlement collected through a grievance or arbitration proceeding will be the two and one-half (2 1/2%) percent assessment which is due on all earnings.

E. If a Member fails to observe these Work Rules and Guidelines, does not report an employer's contract violations promptly or agrees to royalty reductions without Society approval beyond the permitted period, the Member will pay the actual costs of any grievance or arbitration plus ten (10%) percent of the award or settlement (this total not to exceed fifty (50%) percent of such award or settlement), plus the two and one-half (2 1/2%) percent assessment on earnings.

## VI. PLAGIARISM and RESTAGING ANOTHER'S WORK

A. A Member of the Society may not plagiarize another Member's work.



B. A Member of the Society shall notify the Society whenever requested to recreate the work of another Member.

C. A Member of the Society who is employed to recreate another Member's work in any venue, nationally or internationally, must first obtain written warrant from the producer that the producer has obtained the performance rights to recreate the original direction and/or musical staging and/or choreography. The Member shall send a copy of such warrant to the Union.

D. A Member of the Society who believes his/her work has been illegally recreated shall be entitled to ask, in writing, that the Society follow the conciliation procedures outlined in the Bylaws, Article IV, Government, Paragraph 6.

E. If the effort at conciliation referred to therein should fail, the Executive Board shall appoint a Special Committee to verify and substantiate the charge of plagiarism. (If a director charges another director, the committee shall consist of two directors and one choreographer. If a choreographer charges another choreographer, the committee shall consist of two choreographers and one director.)

F. If the charge of plagiarism is deemed by the Special Committee to merit a hearing by the full Executive Board, such hearing shall follow the provisions of the Bylaws, Article X, Trials and Hearings.

G. If the charge of plagiarism is not deemed by the Special Committee to merit a hearing by the Executive Board, the accusing Member may appeal to the Executive Board to conduct a full hearing of the matter under Article X, by requesting, in writing, to appear at an Executive Board meeting, as provided in Article IV, paragraph 6. The Executive Board, in its sole discretion, may then schedule a hearing under Article X.

H. If plagiarism is found, the Executive Board may discipline the accused Member at its discretion, including the levying of a fine. The accused Member may appeal the Executive Board's decision to the Annual Membership Meeting by first notifying the Executive Director in writing within thirty (30) days following the Executive Board's decision.

I. Any Member who wishes to take legal action to protect his/her creative work shall have the right to seek advice from the Society and Counsel.

## VII. DEALING WITH MANAGEMENT

A. A Member of the Society shall notify the Society immediately if dismissed.

B. A Member of the Society shall notify the Society immediately when replacing another Member of the Society on a production.

17

 

C. The Society's Minimum Basic Agreements do not limit the right of a director or choreographer to obtain, through negotiation, higher fees, royalties or any other terms and conditions in his or her individual contract.

D. All of the Society's Minimum Basic Agreements provide for mandatory Pension and Welfare contributions by the producer on behalf of the director and choreographer.

E. A Member of the Society negotiating with a producer or theatre not a Member of any of the organized producer groups which are signatories to a Society Minimum Basic Agreement, or with a producer or theatre unwilling to execute a proper SSDC form contract, shall be responsible for immediately notifying the Society's Executive Director.

## VIII. INITIATION FEES, DUES, AND ASSESSMENTS

A. New Members shall pay an initiation fee of one thousand dollars ($1,000.00) plus first year's dues of one hundred and fifty dollars ($150.00) (totaling $1,150.00) upon joining the Society.

B. A new Member candidate may be granted a payment schedule subject to the following terms:
   1. Anyone who joins without prospective employment under a collective bargaining agreement may pay their initiation fee as follows:
      a. $250.00 (plus pro-rated dues for the current year) with their application.
      b. The greater of $250 or 10% of each contractual fee to be paid upon signing each successive ANTC, MCC or Special Contract, until initiation fee is paid in full.
      c. The maximum time period allowable to pay the balance of the initiation fee will be two years from the initiation date.
   2. Anyone who joins, and subsequently works under one of SSDC's collective bargaining agreements (other than ANTC), will be required to pay their initiation fee in full within six months of their term of employment (Altered April, 1995).

C. Annual dues of one hundred and fifty dollars ($150.00) shall be billed and payable by the Member at the beginning of each dues year.

D. Members shall pay an assessment to the Society of two and one-half percent (2 1/2%) of all earnings received from directing or choreographic assignments.

E. Assessments on royalties shall be capped at $6,000.00 (1995); $6,500.00 (1996); $7,000.00 (1997) annually from each company of a production per dues year (Altered January, 1995).

F. Late payments on dues or assessments shall be subject to a penalty fine of the greater of or $25.00 for each quarter they remain unpaid. Such fine will be assessed April 1, July 1, October 1, and January 1 (Altered January, 1996).

18